658 P.2d 835

**Rosa Maria TORRES, wife of Jesus Crescencio Torres, Deceased, for and on Behalf of herself and their minor children, Maria Del Rosario TORRES, and Maria Isabel Torres, Plaintiffs/Appellees/Cross Appellants,**

v.

**NORTH AMERICAN VAN LINES, INC., a Delaware corporation; C.L. Formy-Duvall and Jane Doe Formy-Duvall, husband and wife, Defendants/Appellants/Cross Appellees.**

**No. 2 CA–CIV 4357.**

Court of Appeals of Arizona, Division 2.

Dec. 1, 1982.

Rehearing Denied Jan. 13, 1983.

Chandler, Tullar, Udall & Redhair by D.B. Udall, William J. Risner and Ronald D. Mercaldo, Tucson, for plaintiffs/appellees/cross appellants.

O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears, P.A. by Richard J. Woods and Larry L. Smith, Phoenix, for defendants/appellants/cross appellees.

## OPINION

HOWARD, Chief Judge.

This is an appeal and cross-appeal from a judgment for compensatory and punitive damages awarded to Mrs. Torres for herself and her two minor children, for the death of her husband. The jury assessed $605,000 compensatory damages against both defendants, Formy-Duvall and North American Van Lines. Punitive damages in the sum of $5,000 were assessed against Formy-Duvall, and the sum of $10,000,000 against North American. On motion for new trial, the court ordered a new trial only as to punitive damages conditioned upon the filing by a specified date of a statement by the plaintiffs accepting the sum of $2,500,-000 as punitive damages. The court expressly found that the punitive damages were excessive but not the result of bias,

passion or prejudice on the part of the jury. Plaintiffs timely filed their notice of acceptance of the remittitur.

Appellants contend on appeal that (1) the punitive damages instruction submitted to the jury was incomplete and prejudicial, (2) the evidence was insufficient to support punitive damages inasmuch as North American's conduct was not shown to be either grossly negligent or the cause of any harm to plaintiffs, (3) the punitive damages award against North American was the result of passion or prejudice, (4) the trial court should have excluded evidence relating to Formy-Duvall's request of the investigating officer that his written statement be deleted from the accident report, and (5) appellants should have been permitted to introduce evidence that Mrs. Torres had remarried. The cross-appeal attacks the trial court's reduction in the amount of punitive damages awarded by the jury against North American.

The plaintiffs' decedent was killed when the tractor-trailer, driven by Formy-Duvall for North American, struck the rear end of a vehicle parked in the emergency lane of Interstate 40 near Holbrook, Arizona. In addition to Mr. Torres, two other persons were killed. At the time of the accident, the weather was clear and visibility was good. The road was straight and level and there was clear vision for approximately one mile. The truck was completely in the emergency lane when its brakes were applied and there was no evidence of any evasive action by Formy-Duvall before impact. At the time of impact, the truck was going 65 miles per hour and Formy-Duvall appeared fatigued. The log book which he was required to keep as he went along was approximately two days behind.

Six expert witnesses in accident investigation, reconstruction or analysis testified at trial. All were in agreement that the accident was caused either by fatigue or inattentiveness on the part of Formy-Duvall. All concluded that Formy-Duvall was driving in excess of the lawful speed limit at the time of the collision with their estimates ranging from 65 to 73.9 miles per hour. Formy-Duvall's version was that he observed the vehicle in the emergency lane and as he approached it in a westbound direction, a lady stepped out into his lane and he veered to the right to keep from hitting her. The expert witnesses discredited Formy-Duvall's "pedestrian-in-the-highway" version which indicated that the pedestrian was no more than five feet into the 12.7-foot slow lane, allowing considerable room to maneuver the eight-foot-wide tractor so as to clear the pedestrian instead of hitting a parked car.

North American's liability was predicated not only on a respondeat superior theory but also on the theory that corporate safety policies constituted a wanton disregard for the safety of the public.

North American has some 8,000 drivers on the road. Formy-Duvall was a driver in the High Value Products Division and his cargoes normally consisted of high value electronic goods, such as computers. North American is the number one hauler of this type in the country. Formy-Duvall was regularly assigned to drive goods from the Los Angeles area to the Boston area, an assignment known as the "Boston Turn." He and his nephew, the co-driver, were returning to Los Angeles at the time of the accident. In violation of federal regulations, neither Formy-Duvall nor his nephew kept a log book current during their trip. Although they testified that a notebook was kept in which mileage by state was recorded and all changes in duty status were noted, it was never produced. They filled out the logs at the end of a trip and mailed them to North American headquarters where they were inspected and kept as required by federal regulations.

The log book requirements are part of the federal regulations controlling the hours of service of drivers, 49 C.F.R. § 395.1, et seq., which are designed to prevent fatigued drivers from endangering the general public who use the same highways. One important rule is the 70-hour rule which provides that no motor carrier shall permit any driver used by it to remain on duty for a total of more than 70 hours in any period of eight

consecutive days. "On duty" time is defined as "all time from the time a driver begins to work or is required to be in readiness to work until the time he is relieved from work and all responsibilities for performing work." In the standard log, on-duty time is the sum of all time shown on both line 3 and line 4. Line 3 shows "driving time" and includes all time spent at the driving controls of a motor vehicle in operation, whereas the line 4 category includes all on-duty time except for actual driving time. Although the regulations include 11 items that must be listed on line 4 time, not one log of Formy-Duvall showed any line 4 time for three months preceding the accident. Thus if on-duty, not driving time is not included in the log, the 70-hour on-duty computation would be based only on line 3 time, i.e., actual driving time.

In 1971, a government safety compliance investigation of North American pointed up the inadequacy of log book verification procedures as to line 4 time. Two safety specialists with the Arizona Department of Public Safety testified that it is impossible for any driver to take a cross-country trip without logging any line 4 time and Arizona Highway patrolmen are instructed to examine a driver's log as to line 4 time. One specialist testified that "if there is no line 4 time, then it is a pretty good indication that there is something amiss." The safety specialist also testified as to the use of fuel purchase receipts and toll receipts to verify the accuracy of log books. In 1964, the federal government accused North American of permitting false logs to be filed. The falsity was discovered primarily through the use of toll receipts. Another investigation was had in 1968 as the result of a letter from a North American driver in which he stated that he had been "pressured by his dispatcher to drive more hours than the regulations tolerated." Approximately 30 false logs were discovered by one verification check.

At the time of this accident in 1979, North American did not use fuel receipts at all to verify log book accuracy and used only certain toll receipts on a spot check basis. One expert based his opinion of North American's safety deficiency on its failure to correct log verification problems that had existed for a number of years. North American has a substantial and sophisticated data processing system and a computer expert testified that it would take a very brief time to set up a program and test it so that North American's computer system could be utilized for log book verification. There was also evidence that North American possesses the personnel and equipment to design and implement an effective dispatch system which would provide a true control of the driver's time. Thus the dispatcher could easily realize that a driver might be approaching the 70-hour limitation of on-duty time in eight consecutive days, and caution him to watch his time.

There was extensive testimony as to the relationship between driver fatigue and traffic accidents. In 1979 and 1980, North American drivers were involved in approximately 1,000 traffic accidents of all types. North American, however, had never attempted to analyze the accident-producing potential of driver fatigue. Although information from each of the accidents involving North American drivers is entered into the company's computerized data processing system, the computerized information was used only by the company's claims department. Thus North American never availed itself of all the accident data with a view to improving safety measures and reducing accidents.

Dr. Brenner, an expert in safety engineering and fleet safety management, analyzed North American's safety policies and related them to this accident. According to him, danger is the product of its two constituent elements, hazard and risk. Here, the risk was that Formy-Duvall would become inattentive due to fatigue from excessive on-duty hours and the hazard was the potential of harm to people resulting from a collision with a fast-moving tractor and trailer. Dr. Brenner defined safety measures as any action, practice or design alternative that will either reduce or eliminate danger, which in turn means reducing risk

or hazard. In his opinion, North American had full knowledge of both the danger and the necessary safety measures. It had been specifically informed that it ought to verify log entries through comparison with toll receipts. It had been investigated for failure to monitor line 4 time. According to Dr. Brenner, its failure to correct the log verification problem over the span of two decades was a key defect in its system. The cost would be minimal where the personnel and computer equipment were already in place. Another key defect in the safety management system was the absence of a trip assignment system to detect and warn drivers who would likely exceed the allowable on-duty hours. He saw no indication of concern as to the possibility that fleet management policies within the company might be defective.

■ Appellants contend that the trial court incorrectly instructed the jury as to punitive damages because it failed to include the knowledge or state of mind of North American as an element. The record shows that at the time appellants voiced their objection to the challenged instruction, the grounds presented to the trial court were not the grounds appellants presented to this court. We will not consider appellants' objection presented for the first time on appeal. *Southern Pacific Transportation Company v. Lueck,* 111 Ariz. 560, 535 P.2d 599 (1975), cert. den. 425 U.S. 913, 96 S.Ct. 1510, 47 L.Ed.2d 763 (1976).

■ Appellants' second contention is that the evidence was insufficient to support punitive damages against North American as its conduct was not shown to be either grossly negligent or the cause of any harm to the plaintiffs. We do not agree. First of all, the jury could logically infer from Formy-Duvall's conduct in failing to log line 4 time, not only on this occasion but in the months preceding, that he was attempting to avoid the 70-hour rule. As noted above, the avowed purpose of the federal regulations as to hours of service of drivers is to protect the public traveling on the highways. Formy-Duvall knew this and disregarded the requirements as to log book

entries of line 4 time. A jury could logically conclude that this manifested a wanton disregard for the safety of others, that is, gross negligence. Since the jury found Formy-Duvall grossly negligent and awarded punitive damages against him, North American was answerable for punitive damages under the doctrine of respondeat superior. *Western Coach Corporation v. Vaughn,* 9 Ariz.App. 336, 452 P.2d 117 (1969).

The issue of punitive damages was also properly submitted to the jury on the theory that North American's failure to police and enforce the 70-hour rule and the federal regulations pertaining thereto, constituted gross negligence. It had been put on notice on several occasions that its drivers were not complying with the regulations. The problem had existed for a number of years and no attempt to take corrective measures had been undertaken. North American's failure to monitor the logs through an appropriate log verification procedure when it had the equipment and personnel to do it expeditiously and without too much additional cost permitted the practice of filing false logs. The company also took no measures, despite the facilities to do so, to establish a proper control of driving time while the drivers were enroute. It should have known that its failure to enforce the 70-hour rule could result in sloppy logging of on-duty time with the concomitant risk of exceeding the time limitation, thus causing fatigue. Submission of the punitive damages issue to the jury was proper.

■ Appellants contend that the trial court should have granted their motion in limine prior to trial to exclude a conversation between an investigating officer at the accident scene and Formy-Duvall. Several police officers were called to the scene of the accident and one of them took a written statement from Formy-Duvall regarding how the accident had happened. After a further investigation at the site, the officer was instructed by the Apache County Attorney to place Formy-Duvall under arrest. The officer than read Formy-Duvall his Mi-

**40**

randa rights and asked some additional questions. Formy-Duvall responded by indicating that he would rather not discuss his statement and asked for its return until he could talk to a lawyer.

Appellant's motion in limine filed in the trial court was based on a theory different from that now argued on appeal. The thrust of their argument below was:

"... the fact that FORMY–DUVALL was charged, his plea and his conviction on that plea are all irrelevant and highly prejudicial. The request to delete the prior statement is similarly irrelevant and prejudicial, because it came up only because criminal charges were being made, and in connection with those charges; and cannot be referred to without bringing in the fact of criminal charges."

Appellants' argument on appeal is that it was error to allow testimony about Formy-Duvall's request for return of his written statement because the request was an exercise of his constitutional privilege against self-incrimination. We cannot, by any stretch of the imagination, interpret appellants' motion or argument in the trial court as the reasonable equivalent of the argument on appeal. We therefore decline to consider appellants' argument as appellate review is limited to the posture of the case in the trial court. *County of Cochise v. Beckman,* 11 Ariz.App. 19, 461 P.2d 498 (1969).

■ Appellants contend that they should have been permitted to introduce evidence of Mrs. Torres' remarriage because she opened the door to such evidence through the testimony of a witness that Mrs. Torres was, at the time of trial, still reclusive and sorrowful. The witness testified that prior to her marriage to the decedent, Mrs. Torres had been extremely shy, bashful, self-conscious and withdrawn. During her marriage, she became more sociable and outgoing. After her husband's death and at the time of trial, according to the witness, Mrs. Torres had gone back to being the way she was before marriage. It is well settled in Arizona that a spouse's remarriage is inadmissible in a wrongful

death action. *Taylor v. Southern Pacific Transportation Company,* 130 Ariz. 516, 637 P.2d 726 (1981); *State v. Cress,* 22 Ariz. App. 490, 528 P.2d 876 (1974); *Hing v. Youtsey,* 10 Ariz.App. 540, 460 P.2d 646 (1969); *City of Phoenix v. Whiting,* 10 Ariz. App. 189, 457 P.2d 729 (1969). The trial court properly excluded evidence of Mrs. Torres' remarriage.

■ The plaintiffs have cross-appealed, contending that the trial court abused its discretion by granting a remittitur of $7.5 million from the amount of punitive damages awarded against North American. They recognize that the exercise of the power of remittitur rests in the sound discretion of the trial court. *Spur Feeding Company v. Fernandez,* 106 Ariz. 143, 472 P.2d 12 (1970). Although the trial court expressly found that the punitive damages awarded by the jury were not the result of passion or prejudice, it did find such award excessive. Of course by ordering a reduction in damages instead of setting aside the verdict, the trial judge determined that the verdict was not the result of passion or prejudice. *Alires v. Southern Pacific Company,* 100 Ariz. 6, 409 P.2d 714 (1966).

■ The initial responsibility for reducing excessive verdicts is with the trial court. *Newman v. Piazza,* 6 Ariz.App. 396, 433 P.2d 47 (1967). The parties to this appeal have cited numerous cases from our own jurisdiction or others. However, as we commented in *Wry v. Dial,* 18 Ariz.App. 503, 503 P.2d 979 (1973), references to verdicts in other cases is a dangerous game. The same principle would apply to punitive damages as no two defendants are alike and no two juries are alike.

■ We cannot find that the trial judge abused his discretion in ordering the remittitur. An "abuse of discretion" is discretion manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons. *Quigley v. City Court of the City of Tucson,* 132 Ariz. 35, 643 P.2d 738 (1982). There is no fixed standard for assessment of punitive damages—the touchstone is reasonableness. 25 C.J.S., Dam-

ages, § 126(1). We note that the trial judge who granted a remittitur here is no novice in the trial of personal injury cases and is a highly regarded trial judge in this state with vast experience in the trial of personal injury lawsuits. He concluded that $10 million was unreasonable and that $2.5 million was a reasonable sum to achieve the purpose of punitive damages. In order to find that he abused his discretion or acted arbitrarily or capriciously, we must find that under similar circumstances no reasonable trial judge would have ordered a remittitur. *Quigley v. City Court of the City of Tucson,* supra. This we are unable to do and therefore do not interfere.

Affirmed.

HATHAWAY and BIRDSALL, JJ., concur.