736 P.2d 1163

**CARTER–GLOGAU LABORATORIES, INC., Plaintiff-Appellee Cross-Appellant,**

v.

**CONSTRUCTION, PRODUCTION & MAINTENANCE LABORERS' LOCAL 383, Defendant-Appellant Cross-Appel-lee.**

Nos. 1 CA–CIV 8107, 1 CA–CIV 8128.

Court of Appeals of Arizona, Division 1, Department A.

Oct. 30, 1986.

Reconsideration Denied March 5, 1987.

Review Denied May 12, 1987.

Snell and Wilmer by Lawrence F. Winthrop and Gerard C. Morales, Phoenix, for plaintiff-appellee cross-appellant.

Connerton, Bernstein & Katz by Robert J. Connerton and Linda Lipsett, Washington, D.C., and Vlassis & Ott by George P. Vlassis and Katherine Ott, Phoenix, for defendant-appellant cross-appellee.

## OPINION

GREER, Presiding Judge.

This action was brought by Carter-Glogau Laboratories, Inc. (plaintiff) against Construction, Production and Maintenance Laborers' Local 383 (defendant) and Laborers' District Council.[1] Plaintiff alleged that defendants were vicariously liable for the unlawful acts of their members during

---

1. The District Council is composed of Local 383 and an affilliate local in Tucson. Basically its function is to coordinate efforts between the two locals and to negotiate collective bargaining agreements.

the course of a strike in 1980 and 1981 at the Carter-Glogau manufacturing facilities in Glendale. Plaintiff sought recovery of expenses incurred for security measures taken, reimbursement for property damages sustained by non-striking employees, and punitive damages as a result of wrongful strike activity.

A jury trial was held resulting in a verdict for the plaintiff assessing compensatory damages of $118,672.62 and punitive damages in the amount of $600,000 against Local 383 only.[2] Local 383 filed a motion for new trial and in the alternative for remittitur. The trial court granted the remittitur reducing the punitive damage award to $200,000 but denied the motion for new trial. Local 383 appealed from the judgment and denial of the motion for new trial raising four issues:

(1) Whether federal labor policy or the First Amendment of the United States Constitution require our state courts to apply the "clear proof" standard set forth in § 6 of the Norris-Laguardia Act in a tort action against a labor union?

(2) Whether the trial court erred in allowing the damage award?

(3) Whether the trial court's instructions to the jury were erroneous?

(4) Whether the verdict was a result of passion or prejudice?

The company cross-appealed arguing the trial court abused its discretion by ordering the remittitur. We affirm.[3]

## I. FACTS

Viewing the evidence and inferences therefrom in a light most favorable to upholding the judgment, *Gann v. Morris*, 122 Ariz. 517, 596 P.2d 43 (App.1979), the facts necessary to resolve the issues are as follows.

On November 18, 1980 the then-existing collective bargaining agreement between Local 383 and Carter-Glogau expired. Local 383 began picketing the following morning and continued to picket for several months thereafter. During the course of the strike, picketers' actions toward non-striking Carter-Glogau employees often took the form of threatened violence, sexual harassment, and threatened and actual property damage. Evidence adduced at trial shows that specific actions of picketers during the strike included, *inter alia*, the repeated throwing of bent nails onto the employee parking lot surface, throwing of acid onto employees' cars, harassing of non-striking workers by following them home from work, spitting into the face of a non-striking worker, and numerous explicit threats of physical violence and sexual harassment. The evidence also indicated that on many occasions union stewards, a union business agent, and picket captains not only acquiesced in and approved of these activities but on many occasions actively participated in them.

As a result of these incidents plaintiff hired security guards and consultants, installed security cameras, and reimbursed non-striking employees for damage done to their automobiles. This law suit was brought to recover these expenses incurred by the plaintiff.

## II. ANALYSIS

A. Does § 6 of the Norris-Laguardia Act require that the "clear proof" standard apply in a tort action brought against a labor union in a state court?

At trial the court chose to use the normal "preponderance of the evidence" standard generally applicable to civil cases. Defendant contends that federal labor policy and the First Amendment of the United States Constitution require us to apply the standard of "clear proof" under § 6 of the Norris-LaGuardia Act. That section provides:

No officer or member of any association or organization, and no association or organization participating or interested

---

**2.** A motion for directed verdict on behalf of the District Council was granted at the close of plaintiff's case in chief.

**3.** Our resolution of this appeal renders it unnecessary to decide whether Local 383 is precluded from denying acts of unprotected misconduct and its responsibility for the same as alleged by plaintiff in its reply brief.

354

in a labor dispute, shall be held responsible or liable in any court in the United States for the unlawful acts of individual officers, members or agents, except upon *clear proof, of actual participation in or actual authorization of, such acts, or of ratification of such acts after knowledge thereof.* (Emphasis added). 29 U.S.C. § 106. Section 106 was passed in 1932 out of "the simple concern of Congress ... that unions had been found liable for violence and other illegal acts occurring during labor disputes which they had never authorized or ratified and for which they should not be held responsible." *Ramsey v. United Mine Workers,* 401 U.S. 302, 309, 91 S.Ct. 658, 663, 28 L.Ed.2d 64, 70 (1971). Defendant argues that *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) mandates the application of § 6 to state tort claims against unions in state court as a matter of federal labor policy thereby pre-empting contrary state law. We disagree.

The plaintiff in *Gibbs* sued the United Mine Workers of America under § 303 of the Labor Management Relations Act, 29 U.S.C. § 187, and under the common law of Tennessee in federal court. He alleged the international union was responsible, *inter alia,* for the loss of a haulage contract and his job as mine superintendant because members of the UMW's Local 5881 engaged in acts of violence to prevent the opening of the mine where Gibbs was employed. After a jury trial, Gibbs was awarded compensatory and punitive damages. On motion, the trial court set aside that part of the award with respect to the haulage contract and the § 303 LMRA claim, but upheld the state law claim for interference with the employment relationship after remitting the award. The Court of Appeals for the Sixth Circuit affirmed. In *Gibbs* the Supreme Court held:

> Plainly, § 6 applies to *federal court* adjudications of state tort claims arising out of labor disputes, whether or not they are associated with claims under § 303 to which this section does not apply.

*Id.* at 737, 86 S.Ct. at 1144, 16 L.Ed.2d at 234 (emphasis added). The court also noted:

This Court has consistently recognized the right of states to deal with violence and threats of violence appearing in labor disputes, *sustaining a variety of remedial measures against the contention that state law was pre-empted by the passage of federal labor legislation.* (Citations omitted). (Emphasis added).

*Id.* at 729, 86 S.Ct. at 1140, 16 L.Ed.2d at 230.

It is this language of the court's opinion which we find to be dispositive of this issue; we do not read *Gibbs* as requiring us to apply § 6 to a state tort claim against a union in our courts.

In *Hiestand v. Amalgamated Meatcutters, etc.,* 233 Kan. 759, 666 P.2d 671 (1983), defendant labor union requested a jury instruction which complied with § 6 of the Norris-Laguardia Act. Instead, the trial court instructed the jury to find union responsibility only upon "proof of actual participation in or actual authorization of any such acts or of ratification of such acts after actual knowledge thereof." Upon appeal the union objected to the deletion of the word "clear" from the jury instruction complaining the standard of proof required was reduced from a clear and convincing standard to a preponderance of the evidence standard. The court noted:

> Federal courts must follow 29 U.S.C. § 106, *but state courts are not bound by the clear, unequivocal and convincing proof standard of 29 U.S.C. § 106.* (Citations omitted).
>
> . . . .
>
> *The adoption of the 'clear proof' standard is a matter of policy since 29 U.S.C. § 106 applies only to federal courts.*

*Id.* at 763, 666 P.2d at 674–75 (emphasis added). The court went on to hold that as a matter of public policy in Kansas, section 6 of the Norris-Laguardia Act was to be adopted in their state courts.

We agree that the adoption of the "clear proof" standard in state court actions involving labor unions is a matter of individual state policy. However, we do not find

that the public policy of Arizona mandates the application of section 6.

█ Since there are no cases in Arizona resolving this issue, we look to our state statutes to determine what the policy of Arizona is with respect to union liability for picketline misconduct of its members. The legislature enacted A.R.S. § 23–1301 *et seq.* which governs labor relations in this state. A.R.S. § 23–1304 provides:

> *It is unlawful for an employee, labor organization, or officer, agent or member thereof, by any threatened or actual interference with a person, his immediate family or his property,* to compel or attempt to compel such person to join a labor organization, *to strike against his will* or to leave his employment. (Emphasis added).

Further, A.R.S. § 23–1306 provides:

> *A person who violates any provision of this article,* or entered into an agreement containing a provision declared illegal by this article, or who brings about the discharge of or denial of employment of any person because of non-membership in a labor organization shall be liable to the person injured as a result of such act or provision and may be sued therefore, and in such action *any labor organization, subdivision, or local thereof shall be bound by the acts of its duly authorized agents acting within the scope of their authority,* and may sue or be sued in its common name. (Emphasis added).

The absence in the above statute of any "clear proof" standard of liability applicable to unions for acts of its members lead us to conclude that Arizona public policy would not impose a higher standard of proof other than what is provided for in the normal rules of agency. The fact that Norris-LaGuardia was in existence at the time of the drafting and passage by referendum of Arizona's "right to work" legislation in 1947 and 1948 convinces us that the people of this state deliberately chose not to adopt the more stringent standard of proof. We cannot read a meaning into a statute that is not within the manifest intent of the legislature as gathered from the statute itself.

*State ex rel. Smith v. Bohannon,* 101 Ariz. 520, 524, 421 P.2d 877, 881, *appeal dismissed* 389 U.S. 1, 88 S.Ct. 55, 19 L.Ed.2d 1 (1966). We hold that Arizona courts are not required to apply the § 6 clear proof standard of the Norris-LaGuardia Act in cases involving labor unions as a matter of state policy. This result keeps our normal rules of agency liability consistent and understandable.

█ The union next contends the jury should have been instructed on the "clear proof" standard in § 6 of the Norris-La-Guardia Act because failure to do so violated the First Amendment to the United States Constitution. The union relies upon language in *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982) in claiming that the presence of activity protected by the First Amendment imposes restraints on the grounds that may give rise to damage liability and on the persons who may be held accountable for those damages. They also cite *Claiborne Hardware* for the proposition that liability cannot be imposed "without a finding that ... [the union] authorized—either actually or apparently—or ratified unlawful conduct." *Claiborne Hardware,* 458 U.S. 886, 931, 102 S.Ct. 3409, 3435, 73 L.Ed.2d 1215, 1248 (1982). While we agree with the language of *Claiborne Hardware* adopted by appellant, we do not find it inconsistent with our result here. Furthermore, we find the facts of *Claiborne Hardware* to be inapposite to our case.

*Claiborne Hardware* involved the boycott of white-merchant-owned businesses by black citizens of Claiborne County, Mississippi. Several of the merchants brought suit against, *inter alia,* the NAACP, seeking damages as well as injunctive relief from further boycott activities. The trial court found the NAACP liable on a common law tort theory, which result was upheld by the Mississippi Supreme Court. The United States Supreme Court reversed the judgment of liability against the NAACP because there was *no* evidence that any violent activity was actually or

apparently authorized by the national organization. The court stated:

> The associational rights of the NAACP and its members has been recognized repeatedly by this court. The NAACP—of course may be held responsible for the acts of its agents throughout the country that are undertaken within the scope of their actual or apparent authority. (Citation omitted). Moreover, the NAACP *may be found liable for other conduct for which it had knowledge and specifically ratified.*
>
> *The chancellor made no finding that Charles Evers or any other NAACP member had either actual or apparent authority to commit acts of violence or to threaten violent conduct.* The evidence in the record suggests the contrary. Aaron Henry, president of the Mississippi state branch of the NAACP and a member of the board of directors of the national organization testified that the statements attributed to Evers were directly contrary to NAACP policy. Record 4930. *Similarly, there is no evidence that the NAACP ratified—or even had specific knowledge of—any of the acts of violence or threats of discipline associated with the boycott.*
>
> To impose liability without a finding that the NAACP authorized—either actually or apparently—or ratified unlawful conduct would impermissibly burden the rights of political association that are protected by the First Amendment. (Emphasis added).

*Id.* at 930–31, 102 S.Ct. at 3434–35, 74 L.Ed.2d at 1247–48.

The facts of *Claiborne Hardware* clearly distinguish it from our case. Unlike *Claiborne Hardware,* the record here clearly indicates Local 383 organized, supported and directed the strike activity. Further, wrongful conduct was engaged in directly and ratified by Local 383 officers. *Claiborne Hardware,* does not support defendant's contention that we are required to apply the "clear proof" standard in our courts due to First Amendment considerations.

Accordingly, based upon the foregoing we hold that the clear proof standard in § 6 of the Norris-Laguardia Act is not to be applied in our courts in tort actions brought against a labor union.

B. Did the trial court incorrectly instruct the jury on the scope of protected activity, and thereby err in allowing a damage award for losses caused by protected activity?

 Appellant argues that the damage award represents losses caused by protected activity, and that security measures taken were not the result of unprotected activity on the picketline. In deciding where the proper scope of protected activity lies in a labor strike context, we adopt considerations used by the Connecticut Supreme Court in *Hartford Division, Emhart Industries Inc. v. Amalgamated Local Union 376, UAW,* 190 Conn. 371, 461 A.2d 422 (1983). *Hartford* was a case involving picketline activity very similar in nature to the facts of our case. We hold that if "spoken threats" and "moral intimidation" reach a point where a trial court may reasonably conclude that "physical violence and property damage is feared, then actions of picketers have gone beyond a protected level." *Id.* at 396–97, 401 A.2d at 436.

The following instruction was provided to the jury:

> You are instructed that the following conduct is not protected or privileged under either the First Amendment to United States Constitution or the state or national labor laws:
>
> 1. Preventing or unreasonably delaying ingress and egress to an employer's place of business;
> 2. Damages to vehicles of non-striking employees;
> 3. Threatening non-striking employees with bodily harm;
> 4. Verbal harassment and threats where the conduct of the threatening party gave 'a sense of immediacy and credence' to the threats;
> 5. Photographing or recording license numbers of non-striking employees, if

such conduct intimidates or coerces working employees; and

6. Making of obscene remarks and gestures of a sexually suggestive nature to non-striking employees where such conduct intimidates or coerces those employees.

We find that the jury instructions given are consistent with our definition of protected activity given above. Defendant's proposed instruction number 105 which stated that the use of "obscene and vulgar language," the making of "abusive threats," and engaging in "minor scuffles with non-striker," were protected activities not only misstates the law but is clearly against public policy. Accordingly, we find no error in the instructions as given. Under our definition, we find that the evidence clearly demonstrates the trial court could have reasonably found the union's activities to be unlawful and unprotected.

■ We also find the award to be supported by competent expert testimony relating to the reasonableness and the necessity of the security measures taken in light of the unlawful conduct that was exhibited during the strike. Mr. William J. Overman, of R.H. Investigation testified that he was hired either the first or second day of the strike to evaluate the need for security measures of the manufacturing factilties. Mr. Overman had recommended and implemented the use of a car patrol. But when reports of employee harassment and intimidation, the introduction of nails into the parking lot and the throwing of acid onto employees' automobiles were received, a foot patrol was established to walk the picketline in order to deter such acts. Testimony also indicates that security was evaluated on a daily basis. Once wrongful activity ceased, security measures were scaled down. Evidence presented indicated that the expenses incurred for security measures were reasonable and necessary as a result of unlawful strike activity. Therefore we hold that the court's award of compensatory damages was not erroneous.

■ We also find that an award of punitive damages is not improper under these facts.[4] The purpose of punitive damages is to punish conduct which has occurred or deter similar future conduct. *Cassel v. Schacht*, 140 Ariz. 495, 496, 683 P.2d 294, 295 (1984). Such damages are to be "based on gross, wanton, malicious and oppressive conduct or on conduct which shows spite, ill will or reckless indifference to the interest of others." *Salt River Valley Water Users' Ass'n v. Giglio*, 113 Ariz. 190, 202, 549 P.2d 162, 174 (1976). Also, a party cannot be awarded punitive damages absent a finding that it has suffered actual damages. *Quinonez ex rel. Quinonez v. Andersen*, 144 Ariz. 193, 198, 696 P.2d 1342, 1347 (1984).

■ The evidence clearly indicates that defendant's tortious conduct consisted of acts of spite, ill will or reckless indifference to the interest of others. In addition, the jury properly found that plaintiff suffered actual damage, as discussed above. Therefore, we find the award of punitive damages was proper in this case.

### C. Was the verdict the result of passion or prejudice?

Defendant contends the size of the jury verdict indicates the jury was misled by the

---

**4.** We do note our supreme court's recent decision in *Linthicum v. Nationwide Life Ins. Co.*, 150 Ariz. 326, 723 P.2d 675 (1986) as we consider the issue of punitive damages. *Linthicum* would require that the trier of fact find clear and convincing evidence of a defendant's evil mind before granting an award of punitive damages. In declining to find that *Linthicum* requires remand on the punitive damages issue we note two specific points: (1) Appellants actions easily fit into several of the categories of wrongful conduct which were found in *Linthicum* to justify an award of punitive damages. We note particularly "intentional misconduct," as well as "malice," "willful acts" and "indifference to the rights of others." *Id.* at 330–31, 723 P.2d at 679–80. The obvious intentional nature of the acts involved is clearly in accord with *Linthicum's* "focus on the wrongdoer's mental state." *Id.* at 329, 723 P.2d at 678. (2) Appellant failed to raise at trial or on appeal the clear and convincing burden of proof required for an award of punitive damages. "The failure to raise an issue either at the trial level or in briefs on appeal constitutes a waiver of the issue." *Van Loan v. Van Loan*, 116 Ariz. 272, 274, 569 P.2d 214, 216 (1977).

court's instructions regarding what was unprotected activity.

■ In resolving as we have the jury instruction issue raised by defendant, we conclude that the instruction as given did not mislead the jury. In addition, the size of a damage award is not of itself conclusive in determining whether a verdict was the result of passion and of prejudice. "[A]n exaggerated measurement of damages in a field in which the ideas of reasonable men may differ does not of itself lead to the conclusion that the verdict was based upon motives improper for the jury to entertain." *Miller v. Condon*, 66 Ariz. 34, 40, 182 P.2d 105, 109 (1947) quoted in *Stallcup v. Rathbun*, 76 Ariz. 63, 66, 258 P.2d 821, 823 (1953). "The test for whether the jury award is the result of passion or prejudice is whether the amount of the jury verdict is so unreasonable and outrageous as to shock the conscience." *Mammo v. State*, 138 Ariz. 528, 532, 675 P.2d 1347, 1351 (App.1983). We find the jury verdict to be neither unreasonable nor outrageous. Also, by ordering a remittitur of damages upon appellant's motion for a new trial, the trial court accepted the verdict as to liability and concluded that the verdict was not the result of passion or prejudice. *Torres v. North American Van Lines*, 135 Ariz. 35, 40, 658 P.2d 835, 840 (App.1982). *Alires v. Southern Pacific*, 100 Ariz. 6, 14, 409 P.2d 714, 719 (1966).

■ Further, appellant contends that the admission of "incident reports" contributed to passion and prejudice in the jury's verdict. These reports were prepared during the course of the strike by non-striking Carter-Glogau employees and contained details of the damages and abuse suffered by them as a result of strike activity. Appellant argues that the reports should have been admitted solely for the purpose of showing that Carter-Glogau had notice of picketline misconduct. Appellant claims that the failure to give a corresponding limiting instruction "fueled the passion and prejudice" of the jury. We disagree. Arguably, the evidence contained in the reports may be cumulative, given that the contents of the reports were testified to by those who originally created them. In that respect it may be argued that the trial court perhaps should have given a limiting instruction as to the use of the reports. But the mere fact that evidence may be cumulative is not a ground for reversal, especially when what was contained in the reports was presented to the jury through other evidence. *Zier v. Shamrock Dairy of Phoenix*, 4 Ariz.App. 382, 384, 420 P.2d 954, 956 (1966). Improper admission of evidence is reversible error only if a substantial right of a party is involved. *State ex rel. LaSota v. Arizona Licensed Beverage Ass'n*, 128 Ariz. 515, 523, 627 P.2d 666, 674 (1981), or if we are convinced that absent the error, the jury would have reached a different verdict. *Groener v. Briehl*, 135 Ariz. 395, 398, 661 P.2d 659, 662 (App.1983). We find neither to be the case here. We hold that admission of the incident reports without a limiting instruction was not reversible error. For all of the foregoing reasons, we hold that the verdict was not a result of passion and prejudice.

D. Did the trial court abuse its discretion by remitting a portion of the punitive damage award?

On cross-appeal, the plaintiff contends that the trial court abused its discretion when it reduced the punitive damage award from $600,000 to $200,000.

■ In order to find that the trial judge abused his discretion we must find that under similar circumstances no reasonable judge would have ordered a remittitur. *Torres, supra*, 135 Ariz. at 41, 658 P.2d at 841. "The greatest possible discretion is given to the trial court with respect to the alteration of the verdict ... because, like the jury, it has had the opportunity to hear the evidence and observe the demeanor of witnesses." *Mammo v. State*, 138 Ariz. 528, 533–34, 675 P.2d 1347, 1352–53 (1983). There were facts in the record from which a reasonable judge could conclude that the amount of the judgment was excessive and that remittitur should be entered. We conclude that the trial court did not abuse its

discretion in remitting a portion of the punitive damage award.

Accordingly, the judgment and denial of the motion for new trial are affirmed.

KLEINSCHMIDT and GRANT, JJ., concur.