NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

MARY ANN MENDOZA, *Plaintiff/Appellant*,

*v.*

STATE OF ARIZONA, *Defendant/Appellee*.

No. 1 CA-CV 18-0350
FILED 01-07-2020

Appeal from the Superior Court in Maricopa County
No.  CV2015-051831
The Honorable Aimee L. Anderson, Judge *Retired*

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED**

COUNSEL

The Leader Law Firm, Tucson
By John P. Leader
*Co-Counsel for Plaintiff/Appellant*

Robbins & Curtin, PLLC, Phoenix
By Joel B. Robbins, Anne E. Findling
*Co-Counsel for Plaintiff/Appellant*

Zachar Law Firm, PC, Phoenix
By Christopher J. Zachar
*Co-Counsel for Plaintiff/Appellant*

Fennemore Craig, P.C., Phoenix
By Douglas C. Northup, Philip L. Brailsford
*Co-Counsel for Defendant/Appellee*

Arizona Attorney General's Office, Phoenix
By G. Michael Tyron
*Co-Counsel for Defendant/Appellee*

---

**MEMORANDUM DECISION**

Judge David D. Weinzweig delivered the decision of the Court, in which Presiding Judge Randall M. Howe and Judge Jennifer M. Perkins joined.

---

**W E I N Z W E I G**, Judge:

¶1          This is a wrongful death action.  Mary Ann Mendoza appeals the superior court's exclusion of her expert witnesses and its entry of summary judgment for the State of Arizona and the Arizona Department of Transportation ("ADOT").  We affirm in part, reverse in part and remand for further proceedings.

**FACTS AND PROCEDURAL BACKGROUND**

¶2          Just after midnight on May 12, 2014, a motorist called 911 to report that Raul Silva-Corona ("Corona") was driving northbound in the southbound lanes of State Route 101 near Cactus Road.  From there, Corona would drive in the wrong direction for over 30 miles—spanning three Arizona freeways—before colliding with Brandon Mendoza's oncoming vehicle.  Both drivers died instantly.  A post-mortem exam revealed that Corona had methamphetamine and almost three times the legal limit of alcohol in his blood.

¶3          A pair of ADOT operators watched the tragedy unfold from ADOT's Traffic Operations Center, where ADOT monitors traffic conditions and disseminates public information.  The Operations Center also has programmatic control over the large digital signs mounted above and along Arizona's freeways, Dynamic Message Signs ("DMS"), which ADOT uses to inform motorists about hazards and roadway conditions in real time.

¶4          After hearing reports of a wrong-way driver on State Route 101, the ADOT operators used ADOT traffic cameras and police radio to track Corona's vehicle and anticipate his path.  ADOT had not adopted a formal, scripted message to warn motorists about wrong-way driver emergencies.  As a result, the ADOT operators were left to spontaneously

2

craft their own digital DMS warning for motorists in Corona's path. The three-line warning read:

ONCOMING TRAFFIC
AHEAD
KEEP RIGHT

¶5 Mary Ann Mendoza is Brandon's mother. She sued the State alleging ADOT and the Arizona Department of Public Safety ("ADPS") were negligent in failing "to take reasonable measures to prevent wrong-way accidents" and failing "to provide reasonable and appropriate traffic measures and law enforcement in light of the risks involved."

¶6 Mendoza timely disclosed three expert witnesses, including Dr. Robert Bleyl and Dr. Eric Boelhouwer.[1] Dr. Bleyl was disclosed as an expert witness on "highway safety and transportation engineering," but the thrust of his opinion was that Arizona had not reasonably responded to the increase in wrong-way crashes and fatalities on its freeways between 2004 and 2014. He opined that "Arizona has been negligent for decades, failing to address or implement procedures to remedy [the] known problem [of wrong-way drivers] on the state highways," and that Arizona has not deployed the countermeasures used by other states. Meanwhile, Dr. Boelhouwer was offered as a human-factors and warnings expert. He was "also expected to address causation issues," including whether Brandon's death "would probably have been avoided" if ADOT "had displayed a reasonably adequate warning."

¶7 The State deposed Dr. Bleyl and Dr. Boelhouwer. After discovery concluded, the State moved for summary judgment on four grounds, including absolute immunity under A.R.S. § 12-820.01 and qualified immunity under A.R.S. § 12-820.02(A)(1). The State further argued that summary judgment was proper because "Plaintiff cannot establish the standard of care" or its breach, and "cannot establish causation because she cannot show the collision would not have occurred had the State acted differently." Separately, the State moved to exclude the expert testimony of Dr. Bleyl and Dr. Boelhouwer under Arizona Rule of Evidence 702 ("Rule 702").

---

[1] Mendoza also disclosed an expert on police practices, W.D. Robinson. The superior court excluded Robinson's testimony, but Mendoza does not challenge that decision on appeal.

¶8        The superior court later granted all the State's motions in a single minute entry.  It first excluded the expert testimony of Dr. Bleyl and Dr. Boelhouwer because Mendoza had "failed to meet her burden" to show the proposed experts satisfied the requirements of Rule 702.  More specifically, the court excluded Dr. Bleyl's testimony because (a) he was "not qualified as an expert on wrong-way driver countermeasures or the applicable standard of care," (b) his opinions were "unreliable as they are not the product of reliable principles and methods," (c) his opinions were unhelpful "as the opinions are not sufficiently tied to the facts of the particular collision in this case," and (d) he offered "impermissible legal conclusions."  The court then excluded Dr. Boelhouwer's testimony because he was "not qualified on DMS, and [did] not know the applicable standard of care."  It also found his opinions were "not relevant and unreliable as they are not based on the standard of care imposed by law."

¶9        The court then granted summary judgment for the State on grounds of qualified immunity and because Mendoza could not "establish or prove the standard of care," breach of the standard or causation.

¶10        Mendoza moved for reconsideration on both fronts.  She argued that summary judgment was inappropriate because questions of material fact remained on breach and causation, even if the court did not consider her experts' testimony.  She asked the court to reconsider its exclusion of her experts, offered supplemental expert affidavits and sought permission "to retain new experts."  The court denied both motions.  The court found it would be "highly improper" and "contrary" to Arizona law if Mendoza could "select new experts [or] amend her existing experts' opinions to cure any deficiencies."  It also explained the State would suffer "extreme prejudice" and her supplemental affidavits were untimely.[2]

¶11        Mendoza timely appealed, but abandoned her claims against ADPS during briefing.  We have jurisdiction pursuant to A.R.S. § 12-2101(A)(1).[3]

---

[2]        Mendoza does not contest the court's refusal to accept her supplemental expert affidavits and we do not consider the affidavits here. *Tilley v. Delci*, 220 Ariz. 233, 238, ¶ 17 (App. 2009) ("The superior court was not required to accept and examine evidence presented to it for the first time in connection with [a] motion for reconsideration.").

[3]        We deny the State's motion to strike Mendoza's notice of supplemental authorities.

**DISCUSSION**

¶12        We first examine the court's exclusion of Mendoza's expert witnesses, which, if admissible, impacts the propriety of summary judgment.

## I.    Expert Witness Testimony

¶13        Arizona Rule of Evidence 702 governs the admissibility of expert testimony.  Expert testimony is admissible when (a) the expert's scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue, (b) the testimony is based on sufficient facts or data, (c) the testimony is the product of reliable principles and methods, and (d) the expert has applied the principles and methods reliably to the facts of the case.  Ariz. R. Evid. 702.  Courts may also consider whether "an expert developed his opinion based on independent research, or whether the expert developed his opinion 'expressly for the purposes of testifying.'" *State ex rel. Montgomery v. Miller*, 234 Ariz. 289, 303, ¶ 47 (App. 2014) (citation omitted).

¶14        The superior court has broad discretion to admit or exclude expert testimony. *Lohmeier v. Hammer*, 214 Ariz. 57, 64, ¶ 25 (App. 2006).  It serves as the "gatekeeper" to ensure an expert's testimony is reliable and helpful to the jury.  Ariz. R. Evid. 702 cmt. (2012).  But the court must be careful not to "replace the adversar[ial] system" or "supplant traditional jury determinations of credibility and the weight to be afforded otherwise admissible testimony."  *Id*.  Thus, "[c]ross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id*.

¶15        We review the court's decision to exclude an expert's testimony for abuse of discretion, *State v. Bernstein*, 237 Ariz. 226, 228, ¶ 9 (2015), even when presented in the summary judgment context, *Baker v. Univ. Physicians Healthcare*, 231 Ariz. 379, 387, ¶ 30 (2013) (stating that the abuse of discretion standard "equally applies to admissibility questions in summary judgment proceedings").  An "abuse of discretion" exists when the court commits an error of law in reaching a discretionary decision that is "manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons." *Torres for & on Behalf of Torres v. N. Am. Van Lines, Inc.*, 135 Ariz. 35, 40 (App. 1982).

**¶16**        Mendoza bore the burden to prove by a preponderance of the evidence that the testimony of her expert witnesses satisfied the requirements of Rule 702.  *Miller,* 234 Ariz. at 298, ¶ 19.

### A.        Dr. Robert Bleyl

**¶17**        Mendoza first argues the superior court abused its discretion by preventing Dr. Bleyl from offering his expert opinion on whether the State failed to reasonably respond to the wrong-way driver problem on Arizona highways before the Mendoza crash, and whether the State's alleged failure to respond with countermeasures increased the likelihood of Brandon's death.  The court excluded Dr. Bleyl's testimony under Rule 702 on grounds that he was unqualified, and his opinions were unreliable, unhelpful and legal conclusions.

**¶18**        We conclude the court did not abuse its discretion in determining that Dr. Bleyl's opinions were unreliable.  Rule 702 requires that an expert's opinion be based on "sufficient facts or data" and represent "the product of reliable principles and methods."  Dr. Bleyl lacked basic facts and data, and "there [was] simply too great an analytical gap between the data and the opinion offered."  *Miller*, 234 Ariz. at 298-99, ¶¶ 23, 26 (quoting *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997)).

**¶19**        Dr. Bleyl lacked information and knowledge about Arizona's pre-collision efforts and measures to combat the wrong-way driver problem.  *See Lay v. City of Mesa*, 168 Ariz. 552, 554 (App. 1991) ("The trial court did not abuse its discretion in excluding" expert's testimony where "he was not familiar with the [signage placement] standards the City followed.").  Although Dr. Bleyl opines that Arizona "had no system in place to address" the wrong-way driver problem, he was unaware of Arizona's pre-crash countermeasures or "what [the State] actually did" to combat the problem before the crash, conceding that he neither sought nor received an explanation about what Arizona had historically done to prevent wrong-way crashes.

**¶20**        Nor did Dr. Bleyl identify what countermeasures ADOT could or should have deployed to prevent an extremely impaired person from driving into the face of oncoming traffic for over 30 miles, seemingly unaware of the world around him, and avoiding Brandon's tragic death.  He merely "confirmed" that "there are recommendations and things that might be done to resolve and provide countermeasures to address the problem."  And even when he articulated possible countermeasures, he offered no basis for them.  Thus, he opined that Arizona "ought" to expand

its use of "wrong way" signs beyond freeway entrances, but offered no source for his opinion and agreed the signs are not required or addressed by the Manual on Uniform Traffic Control Devices. He also criticized the size and placement of prior signs, but never explained why their height, size and placement were unreasonable. Instead, he only pointed to the State's recent sign modifications, which prove nothing about the prior signage or whether the modifications were needed to meet some minimum standard of care.

¶21        Also problematic is Dr. Bleyl's total reliance on Mendoza's counsel for information crucial to his opinions, without verification, and absence of any independent research, analysis or cognizable methodology. *Miller*, 234 Ariz. at 303, ¶ 47. At his deposition, Dr. Bleyl conceded that he performed no independent research or analysis of Arizona's roadways to determine "what wrong-way signage or detection systems do or do not exist," but instead relied on Mendoza's counsel to furnish the necessary information and articles. Moreover, Dr. Bleyl never even inquired how Mendoza's counsel found or selected the universe of materials to provide. He further recognized that "[i]t's impossible to know what's out there that I don't know about."

¶22        Dr. Bleyl tried to justify his blind reliance by explaining that Mendoza's counsel had hired him "over the years" and "not really cover[ed] up" or "hid[den] specific things" from him that "subsequently [came] up [and] should have been provided," and by vouching that Mendoza's counsel had provided him with "fair and objective" materials. But, while Dr. Bleyl can rely on information provided by counsel in forming an independent opinion, he "cannot forgo his own independent analysis and rely exclusively on what an interested party tells him." *Orthoflex, Inc. v. ThermoTek, Inc.*, 986 F. Supp. 2d 776, 798 (N.D. Tex. 2013).

¶23        Beyond that, Dr. Bleyl conceded he lacked the data to test or confirm the California Department of Transportation report supplied by Mendoza's counsel, which provided the "only basis" for his analysis about the effectiveness of reasonable countermeasures. This omission buttressed the superior court's reliability concerns. *See, e.g.*, *Munoz v. Orr*, 200 F.3d 291, 301-02 (5th Cir. 2000) (describing expert testimony as "unreliable" where premised on plaintiffs' data and expert "did not seek to verify the information presented to him").

¶24        This court is mindful that "[c]ross-examination [and] presentation of contrary evidence" are the "traditional and appropriate means" to "attack[] shaky but admissible" expert testimony, Ariz. R. Evid.

702 cmt., but Dr. Bleyl's testimony is not just shaky—it is unreliable and inadmissible. This is not one of the "close cases" where cross-examination can solve the problem. *Bernstein*, 237 Ariz. at 230, ¶ 18. The superior court found that Dr. Bleyl lacked the foundational knowledge and information to reach a meaningful conclusion on the State's historical approach and contemporary response to wrong-way drivers—he relied solely on others, without question or direction, to marshal the only materials he consulted in forming the conclusion. As such, his testimony was fatally flawed as a matter of law and of no meaningful assistance to the trier of fact.

¶25 Mendoza counters that this court found Dr. Bleyl was qualified and his opinions were reliable in an earlier case. But that case, *Glazer v. State*, 234 Ariz. 305 (App. 2014), *vacated in part*, 237 Ariz. 160 (2015), is irrelevant here. *Glazer* had different facts and issues—placement of freeway median barriers—and Dr. Bleyl offered his expert testimony on a different topic altogether—whether "the State should have installed a median barrier in the area where the crash occurred." *Id.* at 309, ¶ 5. Courts must vet the opinions of an expert witness based on the facts and issue of each case. "[T]he fact that a witness has qualified as an expert on previous occasions does not make him any more qualified to testify in the case at bar." *Englehart v. Jeep Corp.*, 122 Ariz. 256, 258 (1979).

¶26 On this record, we cannot say the superior court abused its discretion in excluding Dr. Bleyl's expert testimony as unreliable.

### B. Dr. Eric Boelhouwer

¶27 Mendoza next argues the superior court erroneously excluded the expert testimony of Dr. Boelhouwer, who concluded that ADOT posted an inadequate and inappropriate DMS warning message, the warning contributed to the accident, and ADOT should have scripted a formal DMS warning for operators to post in wrong-way emergencies. The court excluded this testimony as irrelevant and unreliable under Rule 702, emphasizing his opinions were "not based on the standard of care imposed by law," he did "not know the applicable standard of care," and he "performed no standard of care analysis" related to dynamic freeway warning signs. The court also found Dr. Boelhouwer unqualified because he had "nothing to support his opinions other than his prior general experience in human factors (unrelated to DMS) and his review of documents provide[d] to him by [Mendoza]'s Counsel."

¶28 We reverse in part and affirm in part. The superior court abused its discretion in barring Dr. Boelhouwer's human factors opinion,

including whether the warning language was appropriate and adequate to warn motorists, how humans perceive and react to alternative warning messages and how a different DMS warning might have impacted a driver's behavior. The court did not err, however, in excluding Dr. Boelhouwer's opinion concerning ADOT protocol and any conclusion that warning scripts were required under reasonable state transportation practices.

### 1.      Language of Warning

**¶29**      Mendoza should have been allowed to offer Dr. Boelhouwer's expert opinion that ADOT operators posted an "inadequate" and "inappropriate" DMS message to warn motorists about a wrong-way driver. A human factors expert "may opine about the behavior of an average person in some settings." 1 McCormick on Evidence § 13 (Kenneth S. Broun, ed., 7th ed. 2016).

**¶30**      Dr. Boelhouwer is qualified as an expert to offer his opinion about the adequacy of specific warnings, especially under the "liberal minimum qualification" standard. *State v. Delgado*, 232 Ariz. 182, 186, ¶ 12 (App. 2013) (qualifications of expert witness are "construed liberally"). He has knowledge, education and experience beyond the ken of lay jurors related to "how humans process information, warnings, and instructions." *State v. Davolt*, 207 Ariz. 191, 210, ¶ 70 (2004) ("The test of whether a person is an expert is whether a jury can receive help on a particular subject from the witness."). He has a Ph.D. and master's degree in industrial and systems engineering, and a B.A. in chemical engineering. He belongs to various organizations related to human factors and product safety; works as a product-warning consultant on the format, content and layout of warnings; and has published and presented on human-factors issues.

**¶31**      Rule 702 does not require that Dr. Boelhouwer be the most qualified person to offer an opinion in the particular area of expertise. *See Lay*, 168 Ariz. at 554; *Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1244 (10th Cir. 2000) (holding that human-factors expert testimony was admissible in a products liability action against milling machine manufacturer even though the expert witness lacked firsthand experience with milling machines).

**¶32**      In that regard, the superior court erred by narrowly focusing on Dr. Boelhouwer's experience with wrong-way driver incidents. The State can probe and explore Dr. Boelhouwer's professional focus with a robust cross-examination, but his relative inexperience with highway signs

and wrong-way drivers goes to the weight of his testimony, not its admissibility. *State v. Romero*, 239 Ariz. 6, 11, ¶ 23 (2016) (stating that an expert's "lack of experience in performing toolmark analyses and firearm identification experiments might have affected the weight a juror would give his testimony, but it did not bar its admission"); *see also McMurtry v. Weatherford Hotel, Inc.*, 231 Ariz. 244, 251, ¶ 16 (App. 2013) (explaining that an expert's "background and familiarity with certain building regulations goes to the weight of his testimony, not its admissibility").

**¶33**        Dr. Boelhouwer's warning opinion is also reliable enough to be tested on cross-examination at trial. *Romero*, 239 Ariz. at ¶ 17 ("Careful study may suffice to qualify an expert if it affords greater knowledge on a relevant issue than the jury possesses.") (quoting *State v. Girdler*, 138 Ariz. 482, 490 (1983)). Unlike the opinion of Dr. Bleyl, Dr. Boelhouwer's opinion is the product of independent research, background, experience, training and education. He conducted and relied on his own research and knowledge of human factors and warnings. He reviewed industry and research publications, related standards and studies about the effectiveness of wrong-way driver warnings. He reviewed four depositions and "a significant amount of production from both sides, plaintiff and defense." He relied on scientific literature provided by counsel, but also performed independent research and relied on materials he found on his own.

**¶34**        He examined the warning message at issue, explained how it was flawed and proposed an alternative warning. He generally identified the elements of a proper warning, which should "include a signal word, hazard, and avoidance information." He then challenged the use of "oncoming traffic" as too vague and ambiguous to warn motorists that a vehicle was racing towards them in the wrong direction, and offered "danger" and "wrong way driver" as the "strong, clear" alternative. He also criticized the absence of guidance on how motorists might avoid the danger, pointing to Houston's warning since 2008: "ALL TRAFFIC MOVE TO SHOULDER AND STOP."

**¶35**        His opinion is also relevant. A central issue in this lawsuit is whether the State breached its duty to keep roads "reasonably safe for travel." *See Dunham v. Pima Cty.*, 161 Ariz. 304, 306 (1989). "Where, as here, evidence is offered from which the fact-finder could reasonably conclude that the public agency or jurisdiction should have foreseen a danger to plaintiff from the negligent or inattentive conduct of plaintiff or of another, then the question of the [government's] negligence is one for the jury." *Id.* Dr. Boelhouwer's opinion may help the jury understand the evidence and decide the case.

¶36 The State counters that Dr. Boelhouwer mistakenly believed the DMS message used "caution" instead of "keep right." But Dr. Boelhouwer also challenged the use of "oncoming traffic" and omission of "danger" and "wrong way driver." The State can expose and amplify the point at trial with evidence and cross-examination, but the asserted weakness is not reason to exclude the testimony altogether. *See Pipher v. Loo*, 221 Ariz. 399, 404, ¶ 17 (App. 2009) (challenges to "the accuracy and reliability of a witness' factual basis, data, and methods go to the weight and credibility of the witness' testimony").

¶37 The State also argues that Dr. Boelhouwer is not a traffic engineer and has no basis to address causation and the chances of a car accident. We understand and appreciate the argument, but the State can probe and explore the subject with fulsome cross-examination—casting doubt on whether and how Dr. Boelhouwer's general knowledge and experience in the human-factors world translates to motorists on Arizona highways. Ariz. R. Evid. 702 cmt. (2012) ("Cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). "In close cases, the trial court should allow the jury to exercise its fact-finding function, for it is the jury's exclusive province to assess the weight and credibility of evidence." *Bernstein*, 237 Ariz. at 230, ¶ 18.

### 2. ADOT Protocol

¶38 The court did not abuse its discretion, however, in excluding Dr. Boelhouwer's opinion that ADOT should have responded to wrong-way driver emergencies with warning scripts. Mendoza points to no training or experience that qualifies Dr. Boelhouwer to offer an expert opinion about reasonable state government protocols and strategies in response to transportation safety issues. He has studied no literature and performed no research on reasonable policy decisions and formal government practices.

## II. Summary Judgment

¶39 Mendoza argues the superior court erroneously entered summary judgment for the State on her claims against ADOT. We reverse and remand for the court to consider Dr. Boelhouwer's expert testimony about the DMS warning and human-factors opinions, and determine whether summary judgment remains appropriate. We express no opinion on the State's qualified immunity defense, and the court should consider

the merits of this defense on remand given the allowable parameters of Dr. Boelhouwer's opinions.

**¶40**          Although we do not reach the issue here, we remind the superior court that expert testimony is not required to prove the standard of care in ordinary negligence cases. *Rossell v. Volkswagen of Am.*, 147 Ariz. 160 (1985). This is true because the factfinder "can rely on its own experience in determining whether the defendant acted with reasonable care under the circumstances." *Bell v. Maricopa Med. Ctr.*, 157 Ariz. 192, 194 (App. 1988). In Arizona, juries are composed of motorists who regularly navigate and read signs on the state's highway system. *See Seide v. Rhode Island*, 875 A.2d 1259, 1271 (R.I. 2005) (explaining that expert testimony is not required for determining an officer's standard of care when in high-speed pursuit). By contrast, an average juror would not likely possess the knowledge or experience needed to critique the State's historical strategies and countermeasures to wrong-way drivers.

## CONCLUSION

**¶41**          We affirm the superior court's order excluding Dr. Bleyl's expert testimony, but affirm in part and reverse in part the exclusion of Dr. Boelhouwer's expert testimony. We also remand for further consideration of the State's motion for summary judgment based on admissible record evidence. As the successful party on appeal, Mendoza is awarded her taxable costs upon compliance with ARCAP 21.

