[No. D006453. Fourth Dist., Div. One. Feb. 15, 1991.]

MAGGIO, INC., Plaintiff and Respondent, v.
UNITED FARM WORKERS OF AMERICA, AFL-CIO, Defendant
and Appellant.

852

**COUNSEL**

Dianna Lyons and Barbara Macri-Ortiz for Defendant and Appellant.

Gray, Cary, Ames & Frye, Marcelle E. Mihaila, Jay W. Jeffcoat, Finkle, Davenport & Barsamian and Ronald H. Barsamian for Plaintiff and Respondent.

**OPINION**

**KREMER, P. J.**—The United Farm Workers of America (hereafter UFW or Union) appeals a judgment awarding damages to grower Maggio, Inc. for crop losses, damaged personal property, housing costs for replacement workers and additional security expenses caused by the tortious conduct of UFW strikers during a 1979 strike in the Imperial Valley.

On appeal, the UFW contends the evidence does not support a finding the Union authorized, participated in or ratified tortious activity of the strikers. The UFW contends the court erred in calculating damages, applying the collateral source rule, admitting hearsay statements by labor contractors, admitting a summary of Maggio's damage claims without expert testimony, and denying the UFW's motion to dismiss pursuant to Code of Civil Procedure section 583, subdivision (a) for Maggio's failure to diligently prosecute the case. The UFW also seeks sanctions for Maggio's unsuccessful motion to dismiss the UFW's appeal. We affirm the judgment as modified.

### BACKGROUND

In January 1979, the UFW sanctioned strikes against a number of vegetable growers in the Imperial Valley, including Maggio, after negotiations for

a new contract failed. The strike against Maggio was sanctioned on January 25.

Eight struck growers[1] responded to the strike by forming a Mutual Harvest Effort[2] where they agreed to jointly harvest their lettuce fields, deduct costs and divide the proceeds equally. They recruited replacement workers, coordinated security and conducted a public relations campaign. Within the Mutual Harvest Effort, the growers had varying responsibilities. Maggio had responsibility for photographing and documenting strike activities and for analyzing which fields the Mutual Harvest Effort crew should harvest.

In 1979, the UFW's organization was run through its president, Cesar Chavez, and its executive board. The UFW delegated day-to-day responsibilities for the strike to executive board member Marshal Ganz. He reported directly to Cesar Chavez. Ganz was on the picket lines at least once a week and sometimes more through February 12 or 13 when his position as strike coordinator ended. The picket lines were also visited by other UFW leaders including Cesar Chavez, UFW Vice-President Frank Ortiz who replaced Ganz in handling the day-to-day strike responsibilities in mid-February, and strike officer administrator Jessica Govea. A UFW attorney also participated in noon meetings with the sheriff.

The UFW bargaining units for the individual growers were called "ranch communities." The ranch communities elected members to a "ranch committee" which had authority to discipline someone who violated the union rules through a procedure requiring written notice of charges, a hearing, a vote by the ranch community membership on the appropriate punishment and giving a right of appeal to the UFW Executive Committee.

At the time of the strike, the ranch committees elected picket captains to maintain order on the picket lines and ensure the strikers followed the UFW strike rules. The ranch committee also appointed strike coordinators who had responsibility over the picket captains. At Maggio, the strike coordinator for the first part of the strike was Richard King and the picket captains included: Ramon Ruiz, Jorge Lopez, Roberto Beltran, Aurelio Guerrero, Rojelio Guerrero and Candelario Zamora.

The UFW's constitution pledged nonviolence. The Union's strike rules prohibited drinking, drugs and weapons on the picket line, and the Union had a policy against blocking public streets. Union officials, including Ganz,

---

[1] The eight growers were Maggio, California Coastal Farms, Colace, Growers Exchange, Luette, Saikon, Sun Harvest and Vessey.

[2] Some union supporters called the Mutual Harvest Effort "the circus."

the ranch committee, and the strike coordinator had authority to remove people from the picket line for violating union rules.

The record shows both the strikers and grower personnel were involved in some violence and public disorder. Both sides agree there were a number of days when confrontations occurred where UFW pickets engaged in rock-throwing, blocking access to and from grower facilities or fields, rushing into fields towards replacement workers, throwing nail-type devices[3] on the ground to cause flat tires in grower vehicles, overturning grower vehicles, carrying or using sticks, clubs, sling shots or other weapons.[4] The parties disagree as to whether there were "only . . . isolated incidents of picket line misconduct" (as the UFW contends) or "relentless violence" by the UFW strikers (as Maggio contends). The trial court concluded there were "regular, consistent and repeated acts of unlawful picketing" which "created a climate of violence."

As a result of the strike, Maggio was not able to perform the necessary cultural practices for the crops at the proper times and was not able to fully harvest all the fields. Maggio vehicles and equipment were damaged and Maggio incurred costs of hiring additional security guards and of housing replacement workers in a motel.

The trial court awarded damages to Maggio of $1,562,494 for losses in harvesting carrots, broccoli and lettuce, $100,135 for the hiring of additional security guards, $3,149 for property damage to vehicles, irrigation equipment and other items and $13,675 for providing alternate housing to the labor camp for replacement workers.

DISCUSSION

I

*Liability Issues*

The trial court found "by clear, unequivocal and convincing proof" that the union "authorized, participated in and ratified regular, consistent and

---

[3] Deputy Sheriff John Lemon described these nail devices as follows: "It's a barbed—it's a—take a large nail, or a couple of large nails and you bend them into a star shape. No matter how you throw them on the ground, there will always be one point up. It's mainly used for damaging tires."

[4] Not all these activities occurred on all of the days. The days on which "major incidents" occurred include January 29 (which Maggio labels as "Bloody Monday"); February 4 (confrontation at Maggio carrot field at Worthington and Highline roads); February 5-8 (night picketing at the Sanchez labor camp); February 10 when striker Rufino Contreras was shot and killed; (confrontation at Sun Harvest lettuce field near Verde School Road); February 21 (strikers enter field of nonstruck Abatti and confrontation occurs at Maggio lettuce field at Miller and Chell Roads.)

repeated acts of unlawful picketing from and after January 29, 1979 through June 30, 1979." The court also found the union had "negligently failed to supervise and control the strike and the union's strikers." The court concluded the union's conduct "was not the sole cause" of Maggio's crop losses but was a "substantial cause . . . materially contributing to [Maggio's] injury" because: (1) the union "created a climate of violence which prevented [Maggio] from recruiting sufficient workers to harvest its crops" and (2) the union's "violent conduct . . . rendered [the] harvesting activity [Maggio was able to mount] inefficient in certain cases and impossible in others . . . ."

A.

*The UFW's Liability for the Tortious Acts of Strikers*

■ A union has a right to engage in peaceful picketing. (*City and County of San Francisco* v. *United Assn. of Journeymen etc. of United States & Canada* (1986) 42 Cal.3d 810, 819 [230 Cal.Rptr. 856, 726 P.2d 538].) However, state courts may enjoin unions from mass picketing, violence, threats of violence and obstructions to ingress and egress which threaten public health and safety and may award damages to an employer for tortious acts committed by union members during the conduct of a strike. (*Kaplan's Fruit & Produce Co.* v. *Superior Court* (1979) 26 Cal.3d 60, 69, fn. 5 [160 Cal.Rptr. 745, 603 P.2d 1341]; *City and County of San Francisco* v. *United Assn. of Journeymen etc. of United States & Canada, supra,* 42 Cal.3d 810, 819.) The United States Supreme Court in *Mine Workers* v. *Gibbs* (1966) 383 U.S. 715, 730 [16 L.Ed.2d 218, 230, 86 S.Ct. 1130] affirmed that state courts have the power to " 'grant compensation for the consequences, as defined by the traditional law of torts, of conduct marked by violence and imminent threats to the public order,' [citation]."[5]

■ A union may be held liable for the damages caused by the tortious conduct of its members when the union authorized, participated or ratified the tortious acts. (*Hiestand* v. *Amalgamated Meatcutters, Etc.* (1983) 233 Kan. 759 [666 P.2d 671, 673].) In California, general rules of agency apply to a union's liability for the tortious conduct of its members so that a union is liable for the acts of its officers, agents or employees when they are acting within the scope of their employment. (*J.R. Norton Co.* v. *General Teamsters, Warehousemen & Helpers Union* (1989) 208 Cal.App.3d 430, 443 [256

---

[5] The UFW suggests a court can award damages against a union only for violent conduct or threats of violence. The UFW complains the court here awarded damages based only on "unlawful" conduct. Not only does the context of this case suggest the court awarded damages based on violent conduct and threats of violence, but also the cases make it clear damages may be awarded against a union based on *tortious* conduct.

Cal.Rptr. 246], cert. den. 493 U.S. 894 [107 L.Ed.2d 193, 110 S.Ct. 242].) To impose liability on a union for tortious acts committed by its members, it is not necessary to show the top union officials approved of the violence or illegal conduct; liability may be imposed based on the acts of lesser officials, strike coordinators or picket captains. (See *Mine Workers* v. *Gibbs, supra*, 383 U.S. at p. 732 [16 L.Ed.2d at p. 231] ["the UMW representative"]; *Charles D. Bonanno Linen Service, Inc.* v. *McCarthy* (1st Cir. 1983) 708 F.2d 1, 11, cert. den. 464 U.S. 936 [78 L.Ed.2d 312, 104 S.Ct. 346] ["union's representative"]; *Kayser-Roth Corp.* v. *Textile Workers Union of America* (6th Cir. 1973) 479 F.2d 524, 527, cert. den. 414 U.S. 976 [38 L.Ed.2d 219, 94 S.Ct. 292] [the "strike supervisors"]; see *Ritchie* v. *United Mine Workers* (6th Cir. 1969) 410 F.2d 827 [examining circumstantial evidence of involvement by union members]; *Carter-Glogau Labs* v. *Const. Lab. Local 383* (1986) 153 Ariz. 351 [736 P.2d 1163, 1165, 1169] [union stewards, union business agent and picket captains].)

B.

*Sufficiency of the Evidence to Support the Court's Finding the Union Negligently Supervised the Strikers and Authorized, Participated in and Ratified the Illegal Conduct*

■ The UFW attacks the court's determination the union negligently failed to supervise the strikers and was involved in the illegal strike activity. The UFW argues it knew of the violence only after it was committed:

"The record demonstrates that the Union *became aware after the fact* of various isolated incidents of violence which occurred sporadically during the strike. However, there is no substantial evidence to suggest that the Union leadership ever learned the identities of specific strikers who committed specific acts of violence, or that it took no responsive action." (Italics as added by the Union.)

■ In assessing whether substantial evidence supports the determinations of the trial court, we look at the evidence in the light most favorable to the judgment, accepting as true all the evidence most favorable to the respondent and discarding the unfavorable evidence as not having sufficient verity to be accepted by the trier of fact. (*Hinson* v. *Clairemont Community Hospital* (1990) 218 Cal.App.3d 1110, 1125 [267 Cal.Rptr. 503].) We do not reweigh the evidence, reconsider the credibility of witnesses or reresolve conflicts in the evidence or the reasonable inferences which may be drawn from that evidence; those are the responsibilities of the trial court. (*Overton* v. *Vita-Food Corp.* (1949) 94 Cal.App.2d 367, 370 [210 P.2d 757], disapproved on other grounds in *Parsons* v. *Bristol Development Co.* (1965) 62

Cal.2d 861 [44 Cal.Rptr. 767, 402 P.2d 839].) Our function is only to determine whether *any* substantial evidence supports the findings of the fact finder. (*Leff* v. *Gunter* (1983) 33 Cal.3d 508, 518 [189 Cal.Rptr. 377, 658 P.2d 740].)

■ Here, contrary to the UFW's contention, there was substantial evidence to support the court's determination.[6] It is true there was evidence in the record showing the UFW's constitution and strike rules condemned violence, that Ganz and Chavez counseled the strikers against resorting to violence or disruptions of the public order and that the top leadership of the UFW, following some of the violence, took actions to reduce incidents of violence.[7] However, it is also true that there was substantial evidence showing UFW leadership, including Maggio's strike coordinator and picket captains, were actively involved in instigating violence and other illegal conduct and that the UFW leadership did not enforce its own strike rules and policies condemning violence and blocking access of vehicles and replacement workers.

There was evidence showing Maggio strike coordinator Richard King, Maggio picket captains and other UFW leadership were present at times when rock throwing, rushing fields and blocking access occurred and were aware that there was violence occurring on the picket lines. There was evidence that the picket captains urged strikers to throw rocks and to vandalize grower equipment. There was evidence that King and the picket captains made threats to kill the replacement workers. There was evidence that the UFW could discipline picketers who violated strike rules by pulling them off the picket line and having them work elsewhere yet the evidence tended to show the UFW rarely disciplined picketers.[8] Maggio strike coordi-

---

[6] The trial court here found "by clear, unequivocal and convincing proof" that the UFW "authorized, participated in and ratified regular, consistent and repeated acts of unlawful picketing from and after January 29, 1979 through June 30, 1979." Maggio contends the trial court erroneously applied a clear and convincing proof standard. The UFW contends such a standard was required and was not met. Recently, the court in *J.R. Norton Co.* v. *General Teamsters, Warehousemen & Helpers Union, supra,* 208 Cal.App.3d 430, 437-438, rejected the clear and convincing standard, holding the preponderance of evidence standard applies.

[7] For example, following the death of UFW striker Rufino Contreras, the UFW called off picketing for several days "to cool it off" and Chavez spent over a week talking to people in large and small groups and individually, urging them not to retaliate for Contreras's death.

[8] The UFW cites testimony in the record to show the UFW disciplined picketers. This testimony consists of Ganz's testimony that discipline of picketers "probably did occur" but he could not remember a single specific instance; Ortiz's testimony that he contemplated removing a strike coordinator of another grower but the coordinator left and some pickets were removed from the picket line for yelling, not following orders "not to cuss back and forth," not attending or bringing beer onto the picket line; picket captain Zamora's testimony that one time he told a picketer "that his conduct was not very good and that it would be good if he went away for a while and that he could come back;" and King's testimony he had heard of strikers being disciplined by Growers Exchange, he told one woman from the Sun Harvest

nator King who had responsibility for directing where the picketers went and for supervising the picket captains was unable to recall any Maggio worker being disciplined and stated he had never had a problem with a Maggio picket.

There was evidence that on the first day of violence, January 29, only four days after the UFW had sanctioned the strike against Maggio, King was identified as being one of the strikers who attempted to block the Mutual Harvest Effort workers from leaving the grounds of a grower where they had assembled to go out into the fields. At trial, King admitted he participated in blocking the road and that he knew his act was illegal. He explained he felt it was for a "higher purpose." While King also testified he never "recommended that other Maggio workers should perform similar acts of disobedience," his actions on January 29 belie that testimony.

There was testimony picket captains encouraged strikers to throw rocks and vandalize grower equipment. In particular, there was evidence of a "Fantasma" or "Phantom Crew" organized by the strikers to intimidate growers and replacement workers. This phantom crew was composed of five or six "real strong young men" who would use a black van at night to attack replacement workers and to vandalize irrigation equipment, vehicles and homes belonging to growers and replacement workers. There was testimony that not only was King aware of this phantom crew and what they were doing but that he actively recruited UFW members for the phantom crew. King attempted to recruit Rene Vasquez for the phantom crew, telling Vasquez "[i]t was about breaking some cars, do[ing] bad things to the homes."

King was also involved in distributing to picket captains and picketers nail type devices used to cause flat tires. Picket captain Jorge Lopez obtained the devices from a person in Mexicali. At one point, King had the devices in the back of his pickup truck and distributed them in front of the union's office to picket captains. The picket captains, in turn, distributed the tacks to individual picketers.

The UFW asserts: "There was no showing that Union officials actually had knowledge of the identities of those involved or that they failed to respond . . . ." The record, however, shows it was Union officials themselves, e.g., King and picket captains, who were actively involved and encouraging others to become involved in illegal activity and that the Union rarely disciplined any of the strikers, including King and the picket

group to "shut up and get out of there" and that he never had any trouble with Maggio pickets.

captains, who were involved in illegal activity.[9] Further, the trial court was entitled to infer from the fact that Ganz and other top union officials were often on the picket lines, participated in meetings with the sheriff and from the fact that the Union sometimes posted bail for UFW members who had been arrested, that even the top Union officials were aware of the illegal strike activity. The Union's claim it had only after-the-fact knowledge and an inability to control any of the UFW strikers was rejected by the trial court based on substantial evidence and reasonable inferences drawn from that evidence.[10]

## C.

### Comparative Negligence

■ The UFW contends the trial court erred in not applying comparative negligence principles to this case. The comparative negligence the UFW points to is the alleged negligence of Maggio and the Mutual Harvest Effort to control violence and provocative conduct by security guards and other grower personnel. The UFW argues:

"Since the act of strike breaking is inherently provocative and confrontation can reasonably be expected, *some* steps should have been taken to ensure that both sides of the dispute remained calm. It was apparent that the Mutual Harvest was formed without any procedures to control or

---

[9]The UFW points to evidence showing it conducted investigations following major confrontations to determine what had occurred but these investigations resulted in conflicting stories as to who instigated the conflict and what happened. Richard King, for example, testified that on one day the sheriff pointed out to him a striker who had been throwing rocks. When King approached the individual and asked if he had been throwing rocks, the individual denied it. The Union complains it would be unreasonable to expect the Union "to discipline strikers without proof of wrongdoing simply to insulate itself from a possible finding of negligence." It was not unreasonable, however, for the court to disbelieve the Union was seldom able to identify union members involved in illegal activity given the evidence that the union officials, including Ganz, strike coordinators and picket captains were physically present when illegal activity occurred.

[10]The UFW attempts to distinguish cases where damages were awarded against a union for the tortious activities of its members by pointing to specific facts found in those cases which are allegedly absent here. (E.g., *Kayser-Roth Corp.* v. *Textile Workers Union of America, supra*, 479 F.2d 524 [the UFW explains this case "contained clear proof that the two union officials on the picket line instructed the pickets that they should stop non-strikers from entering the plant 'by any means they could, including stripping off their clothes' "]; *Charles D. Bonnano Linen Service, Inc.* v. *McCarthy, supra*, 708 F.2d 1 [the UFW explains this case involved "many instances of violence before 1976, and at least eight instances during that year" and findings "that the union's representative on the strike line actually participated in the threats and acts of violence"].) The fact that these cases may have involved other, and perhaps stronger, evidence to support a finding an award of damages against the union for tortious conduct does not preclude a finding of liability here.

regulate its principals, agents, employees and security guards during the harvesting activity." (Italics by the UFW, fn. omitted.)

There are several answers to this contention. First, the trial court rejected a finding Maggio or the Mutual Harvest Effort were negligent; the court found "plaintiff's conduct was not a contributing cause of plaintiff's loss." Therefore, the court did not need to apply comparative negligence principles (or, alternatively, implicitly apply the principle, finding zero comparative negligence by Maggio).

Second, the trial court here found the UFW liable based on theories of (1) negligent supervision of the strike and strikers and (2) intentional conduct in authorizing, participating in and ratifying regular, consistent and repeated acts of unlawful picketing. Maggio and the Mutual Harvest Effort had neither the authority nor ability to intervene in the UFW's supervision or discipline of strikers who engaged in illegal activity. Nor did Maggio or the Mutual Harvest Effort participate in the UFW's actions in authorizing, participating in or ratifying illegal conduct by the strikers. In other words, Maggio was not a joint tortfeasor with the UFW for failing to negligently supervise the strikers or in authorizing, participating in or ratifying illegal strike activity by the strikers.[11]

D.

*Hearsay Statements of Contractors*

■ The UFW contends the court erred in allowing labor contractors to testify potential replacement workers for Maggio told them they would not work for Maggio because of fear of the violence associated with the strike. The UFW contends the court erred in allowing this testimony to come in under the state of mind exception to the hearsay rule.[12]

Initially, we note the court did not overrule all of the UFW's objections to labor contractor testimony as to why workers did not want to work for Maggio. The court correctly limited the admissibility of the testimony, as

---

[11] This is not to say that grower personnel did not engage in any tortious activity or to say that the UFW could not have counterclaimed for personal injuries or property damage incurred by strikers and paid for by the UFW which were due to the actions of Maggio's personnel, but only that as far as the actions of the strikers were concerned, the trial court was not required to conclude Maggio had any liability for the damages caused by the illegal conduct of the strikers.

[12] Under Evidence Code section 1250, subdivision (a), a statement of a then-existing state of mind or emotion is not made inadmissible by the hearsay rule if "(1) [t]he evidence is offered to prove the declarant's state of mind, emotion or physical sensation at that time or at any other time when it is itself an issue in the action; or [¶] (2) [t]he evidence is offered to prove or explain acts or conduct of the declarant." (Evid. Code, § 1250, subd. (a).)

acknowledged by the UFW, when the UFW made its second objection, thus indicating the court did not improperly consider the evidence.

More importantly, there was other evidence indicating replacement workers were afraid and there was evidence the UFW engaged in activity designed to frighten those working for Maggio. We conclude that even if the court erred in allowing one labor contractor to testify as to hearsay statements of workers, reversal on this ground is not required because the error was harmless.

## II

### *Damages*

#### A.

#### *Separation of Damages Due to Lawful Versus Unlawful Union Conduct*

■ The UFW contends the court erroneously awarded damages Maggio suffered due to legal activity by the union.

The trial court, in awarding damages, stated the UFW "was not the sole cause of plaintiff's failure to cultivate and harvest it's crops," but that the union's "unlawful conduct was a substantial cause of plaintiff's loss materially contributing to plaintiff's injury."

The trial court found the union's illegal activity was a proximate cause of Maggio's losses[13] and that once Maggio "met its burden of proof that the unlawful strike activity was a substantial cause of plaintiff's damage, the burden then shifted to defendant to show the extent of its contribution to plaintiff's damages, i.e., distinguish the damages caused from lawful conduct from the damages caused by unlawful conduct." The court concluded the UFW had not met this burden.

The UFW argues that damages are limited to the "direct consequences" of violence or threats of violence and contends Maggio had the burden of proving what damages it suffered due to the "direct consequences" of the illegal activity, a burden which Maggio did not sustain. The UFW contends

---

[13] The trial court explained: "The court finds that defendant union was not the sole cause of plaintiff's failure to cultivate and harvest [its] crops, but does find that defendant's unlawful conduct was a substantial cause of plaintiff's loss materially contributing to plaintiff's injury.

"Defendant union was the cause of plaintiff's inability to harvest crops in the following ways:

"a. Defendant created a climate of violence which prevented plaintiff from recruiting sufficient workers to harvest its crops.

"b. Defendant's violent conduct toward such harvesting activity as plaintiff was able to mount rendered that harvesting activity inefficient in certain cases and impossible in others where plaintiff was unable to provide adequate security." (Paragraph numbers omitted.)

the court improperly shifted the burden of separating the losses to the Union based on an erroneous reliance on *Fibreboard Paper Products Corp. v. East Bay Union of Machinists* (1964) 227 Cal.App.2d 675 [39 Cal.Rptr. 64].

In *Fibreboard*, a manufacturer fired all 70 of its maintenance employees because the manufacturer decided to contract out the work to an independent contractor. Fifty of the seventy fired employees were union members. To protest the firing, the local and international unions authorized and established a picket line at the manufacturing plant. The picketers blocked the entrance to the plant, threatened and assaulted replacement workers and prevented the warehousemen, who moved raw materials necessary for production of the company's product, from performing their work. The manufacturer sought, and was awarded by the jury, damages for lost profits caused by tortious activity of the union. The *Fibreboard* court stated:

"Assuming *arguendo* that implicit in the jury's verdict is a finding that the warehousemen stayed away from work both because of fear of violence and union principle, we do not believe it was incumbent upon Fibreboard to show what portion of its damages was caused by the tortious conduct and what part was attributable to the nontortious. We doubt that such a showing could be made. The applicable rule is that one who contributes to damage cannot escape liability because the proportionate contribution may not be accurately measured. [Citations.] It is not necessary that the negligence of the defendant be the sole proximate cause of the damage, but there may be other factors which contribute to the extent of the damage. It is sufficient that such negligence be one of the contributing causes thereof. [Citations.] . . . While it is incumbent upon the party alleging injury to prove the amount of damages, if the damages proven could be reduced proportionately, that burden rests upon the defendant. [Citation.] Prosser states the applicable principle as follows: '[W]here it is clear that a defendant has been at fault and that he has caused some part of the plaintiff's damages, the burden of proof should rest on him to show the extent of his contribution, and that if he cannot sustain it he should be liable for the entire loss.' [Citation.] In more emphatic language, we find the principle stated in *Navigazione Libera T.S.A.* v. *Newtown Creek T. Co.*, 98 F.2d 694, cited in *Cummings* as follows: ' "[W]hen one of the two contributing factors is not the result of actionable fault . . . the single tortfeasor cannot be allowed to escape through the meshes of a logical net. He is a wrongdoer; let him unravel the casuistries resulting from his wrong." ' [Citation.] In the light of the applicable principles Fibreboard has sustained its burden, but the record does not show that defendants have sustained theirs." (*Fibreboard Paper Products Corp. v. East Bay Union of Machinists, supra*, 227 Cal.App.2d at pp. 704-705.)

This language in *Fibreboard* fully supports the court's position but the UFW argues *Fibreboard* is no longer good law because "*Fibreboard* issued *two years before* the controlling case on the subject: *United Mine Workers* v. *Gibbs* (1966) 383 U.S. 715 . . . ." (Italics by the UFW.) The UFW explains *Gibbs* limits an employer's recovery against a union for tortious activity to the damages *directly* caused by the violent or otherwise unlawful picketing.

Contrary to the UFW's contention, *Fibreboard* remains good law and is controlling here. Not only has the *Fibreboard* holding been cited with approval after the *Gibbs* decision by our Supreme Court (see *Haft* v. *Lone Palm Hotel* (1970) 3 Cal.3d 756, 774 [91 Cal.Rptr. 745, 478 P.2d 465]), but *Gibbs* itself supports *Fibreboard*.

In *Gibbs*, the Supreme Court reversed an award of damages against a union because the evidence showed that the only violence that had occurred during the strike occurred on the first day when no representative of the international union was present and that as soon as the international union learned of the violence, it sent a representative with instructions to prevent further violence and no further violence occurred. In analyzing the law upholding peaceful picketing and permitting damages caused by tortious conduct of picketers, the *Gibbs* court reviewed a case, *Milk Wagon Drivers Union, Etc.* v. *Meadowmoor Dairies* (1941) 312 U.S. 287 [85 L.Ed. 836, 61 S.Ct. 552, 132 A.L.R. 1200], which had upheld an injunction against picketing because the peaceful picketing had become "enmeshed with contemporaneously violent conduct which is concededly outlawed." The *Meadowmoor* case reasoned the injunction could properly issue because "acts which in isolation are peaceful may be part of a coercive thrust when entangled with acts of violence." (*Id.* at p. 294 [85 L.Ed. at p. 842].) The *Meadowmoor* court noted the case before it "was set in a background of violence. In such a setting it could justifiably be concluded that the momentum of fear generated by past violence would survive even though future picketing might be wholly peaceful." (*Ibid.* [85 L.Ed. at p. 842]) The United States Supreme Court in *Gibbs*, when it considered the application of the *Meadowmoor* case involving an injunction to the situation in *Gibbs* involving a claim for damages, stated:

"Such special facts, if they appeared in an action for damages after picketing marred by violence had occurred, might support the conclusion that all damages resulting from the picketing were proximately caused by its violent component or by the fear which that violence engendered. Where the consequences of peaceful and violent conduct are separable, however, it is clear that recovery may be had only for the latter." (*Mine Workers* v. *Gibbs, supra*, 383 U.S. 715, 731-732 [16 L.Ed.2d at p. 231], fn. omitted.)

Thus, the United States Supreme Court in *Gibbs* acknowledged an award of damages for all losses occurring during a strike would be proper when, as here, the consequences of peaceful and violent conduct are not separable.[14]

As the Ninth Circuit explained in *Frito-Lay, Inc.* v. *Local U. No. 137, Intern. Broth.* (9th Cir. 1980) 623 F.2d 1354, 1362-1363, certiorari denied 449 U.S. 1013, 1112 [66 L.Ed.2d 472, 841, 101 S.Ct. 571, 922]:

" '[W]hen a union exerts economic pressure to achieve both lawful and unlawful objectives and the consequences were not separable, damages cannot be recovered unless the unlawful objective was a substantial cause of the pressure.' [Citation.] Appellants claim that the underlying object of the strike was lawful—to obtain increased economic benefits for its members—even though the attempt to force multi-employer bargaining was unlawful. They argue that to recover damages Frito-Lay must either (1) distinguish between the effects of the legal and illegal objectives, or (2) if those effects are not separable, establish that the strike would not have occurred absent the illegal objectives.

"[Our earlier decision] does not require that the illegal object be the sole cause of the strike, only that it be a 'substantial' cause or that it 'materially contribute' to the injury, 'notwithstanding other factors contributed also.' [Citation.] The Union's argument misapprehends the principles applicable to proof of causation in cases such as this. The controlling rules derive from tort law principles where more than one factor can be a substantial cause, and no single factor need be the sole causative element. Here the district court properly found the illegal objective to be at least a substantial—if not the sole—cause of the strike; from this the court could reasonably infer a causal relationship between the illegal objectives and the damages attributable to the strike." (*Frito-Lay, Inc.* v. *Local U. No. 137, Intern. Broth., supra,* 623 F.2d at pp. 1362-1363.)

The evidence here supports a finding the illegal activity by the Union and its members was a substantial cause of all the losses suffered by Maggio and that the losses were not separable between those due to legal conduct and those due to illegal conduct.[15] The UFW's own witness on damages, Mark

---

[14] The UFW complains the trial court did not make an explicit finding the losses were not separable. While the trial court did not use the specific word "separable," that clearly was its determination. The court found the illegal conduct of the strikers had created a "climate of violence," proximately caused Maggio's damages, was a substantial cause of the damage and shifted to UFW the burden of distinguishing the damages due to legal versus illegal conduct. Implicit in these determinations is a finding the damages were not separable. (Contrast *Stryjewski* v. *Local Union No. 830, Brewery, etc.* 451 Pa. 550 [304 A.2d 463].)

[15] The UFW in a related argument, contends the court erroneously attributed damages to the activity of the strikers rather than to Maggio's inability to recruit sufficient replacement workers at the very outset of the strike and to the lesser skills and efficiency of the replace-

Lumer, made no attempt to so segregate the losses, admitting that with the knowledge he had, "it was not possible to make the separation between the legal and the illegal portion."[16]

## B.

### Crop Losses

The trial court awarded damages for losses Maggio suffered in its carrot, lettuce and broccoli fields. The UFW has numerous complaints about the damages award.[17]

### Ordinary Business Risk

■ The UFW first complains that the court erred in awarding damages for lost profits based on the UFW's negligent supervision because: "even assuming the court correctly found that defendant breached its duty of ordinary care . . . , and that damages were proximately caused thereby . . . , the award of damages for lost profits for the crop losses (prospective economic advantage) is improper because the injury suffered was precisely plaintiff's *ordinary business risk*.

" . . . . . . . . . . . . . . . . . . .

"Maggio's conduct reflects a conscious decision to take a strike rather than come to terms with the union. Under these circumstances, a risk of losing profits is a given—Maggio and his fellow growers took steps to minimize that loss, a loss that was fully anticipated. Maggio knew he would not be able to harvest his entire crop under strike conditions . . . . He took

---

ment workers. This argument, also is addressed to the ability to separate damages and is not a basis for reversal.

[16] The UFW contends the shifting of the burden of proof denied it due process. The UFW argues "once Maggio demonstrated that *some* picket line misconduct caused *some* losses, rather than presuming that some losses flowed from constitutionally and statutorily protected picketing, the Court, presumed that misconduct caused all claimed damages." To support its claim this resulted in a deprivation of due process, the Union cites *Speiser* v. *Randall* (1958) 357 U.S. 513 [2 L.Ed.2d 1460, 78 S.Ct. 1332], *People* ex rel. *Gow* v. *Mitchell Brothers' Santa Ana Theater* (1981) 114 Cal.App.3d 923 [171 Cal.Rptr. 85] and *Van Atta* v. *Scott* (1980) 27 Cal.3d 424 [166 Cal.Rptr. 149, 613 P.2d 210]. These cases are distinguishable. They involve the burden of proof imposed on the government when it prosecutes individuals for matters touching on Free Speech (*Speiser* v. *Randall, supra; People* ex rel. *Gow* v. *Mitchell Brothers' Santa Ana Theater, supra*) or incarcerates individuals before trial (*Van Atta*). As discussed in the text, *ante,* the courts, while recognizing a union's right to peacefully picket, have required the union to bear the burden of segregating damages once the plaintiff has shown the union's tortious conduct was a substantial cause of its losses.

[17] Among other complaints, the UFW contends damages for lost profits could not be awarded based on a trespass claim or based on interference with business relations. Maggio sued on these theories, but the trial court awarded damages based on theories of negligent supervision and intentional conduct.

an *ordinary business risk*, and as expected, he was not able to harvest all of his lettuce, carrots and broccoli."

The UFW bases this argument on language pulled out of the Supreme Court's decision in *J'Aire Corp.* v. *Gregory* (1979) 24 Cal.3d 799 [157 Cal.Rptr. 407, 598 P.2d 60], a case involving a claim by a tenant for damages to a prospective economic advantage negligently caused by a contractor who was not diligent in performing construction work. In the course of the opinion, the Supreme Court explained: "The chief dangers which have been cited in allowing recovery for negligent interference with prospective economic advantage are the possibility of excessive liability, the creation of an undue burden on freedom of action, the possibility of fraudulent or collusive claims and the often speculative nature of damages. [Citations.]" (*Id.* at pp. 807-808.) The Supreme Court concluded in *J'Aire*:

"However, the factors enumerated in [*Biakanja* v. *Irving* (1958) 49 Cal.2d 647 (320 P.2d 16, 65 A.L.R.2d 1358)] and applied in subsequent cases place a limit on recovery by focusing judicial attention on the foreseeability of the injury and the nexus between the defendant's conduct and the plaintiff's injury. These factors and ordinary principles of tort law such as proximate cause are fully adequate to limit recovery without the drastic consequence of an absolute rule which bars recovery in all such cases. [Citation.] Following these principles, *recovery* for negligent interference with prospective economic advantage *will be limited to instances where* the risk of harm is foreseeable and is closely connected with the defendant's conduct, where damages are not wholly speculative and *the injury is not part of the plaintiff's ordinary business risk*." (*J'Aire Corp.* v. *Gregory, supra*, 24 Cal.3d at p. 808, italics added.)

While suffering losses due to a lawful strike might be "an ordinary business risk," the damages here were awarded for illegal and violent conduct by strikers. The law specifically recognizes such conduct by strikers as tortious and as a basis for recovering damages. We have found no cases deeming tortious activity to be "an ordinary business risk," the UFW has not cited any cases to support its position and nor would be inclined to adopt such a holding as it runs counter to public policy requiring wrongdoers to be liable for their torts.

### The "New Business" Rule

 The UFW next complains the trial court erred because it did not apply "the new business" rule when it calculated Maggio's lost profits.

 "[I]n order to support a lost profits award the evidence must show 'with reasonable certainty both their occurrence and the extent thereof.'

[Citation.]" (*Sanchez-Corea* v. *Bank of America* (1985) 38 Cal.3d 892, 907 [215 Cal.Rptr. 679, 701 P.2d 826], italics deleted.) Damages for loss of profits may be denied to an "unestablished" or new business as being too uncertain and speculative if they cannot be calculated with reasonable certainty. (*S. Jon Kreedman & Co.* v. *Meyers Bros. Parking-Western Corp.* (1976) 58 Cal.App.3d 173, 184-185 [130 Cal.Rptr. 41].) "The ultimate test is whether there has been 'operating experience sufficient to permit a reasonable estimate of probable income and expense,' as stated in [*Natural Soda Prod. Co.* v. *City of L.A.* (1943) 23 Cal.2d 193, 199 (143 P.2d 12)]; or, as phrased in [*Grupe* v. *Glick* (1945) 26 Cal.2d 680, 693 (160 P.2d 832)], 'anticipated profits dependent upon future events are allowed where their nature and occurrence can be shown by evidence of reasonable reliability.'" (*Edwards* v. *Container Kraft Carton etc. Co.* (1958) 161 Cal.App.2d 752, 760 [327 P.2d 622].) Under this rule, damages for lost profits have been denied to a copyright business that did not exist (*Read* v. *Turner* (1966) 239 Cal.App.2d 504 [48 Cal.Rptr. 919, 40 A.L.R.3d 237]), for a motel that never opened (*Engle* v. *City of Oroville* (1965) 238 Cal.App.2d 266 [47 Cal.Rptr. 630]) for a business which operated only for a few days (*Macmorris Sales Corp.* v. *Kozak* (1968) 263 Cal.App.2d 430 [69 Cal.Rptr. 719]) and for a two-month old partnership which had never received a contract (*Patton* v. *Royal Industries, Inc.* (1968) 263 Cal.App.2d 760 [70 Cal.Rptr. 44]).

■ The UFW argues Maggio became a new business when the strike occurred because it "was forced to recruit, hire and train an entirely new and for the most part unskilled, work force prior to resuming normal operations." This argument is completely without merit. Maggio was not a new business; it had been growing produce for years in the Imperial Valley. Under the UFW's theory, nearly every breach of contract or tort committed against a business which resulted in lost profits would also result in creating a new business. This is not the view adopted by the law. Cases applying the "new business rule" generally involve businesses which have been in operation only a very short period of time. (See, e.g., *Grupe* v. *Glick, supra*, 26 Cal.2d 680, 693 [new venture]; *Edwards* v. *Container Kraft Carton etc. Co., supra*, 161 Cal.App.2d 752 [12 days]; *Patton* v. *Royal Industries, Inc., supra*, 263 Cal.App.2d 760 [2 months].)

Further, even if we were to accept the UFW's argument that Maggio somehow became a "new business" due to the UFW's strike, we would not reverse. The UFW's claim of reversal is based on Maggio's alleged failure to meet the new business rule's requirement of "later profitable operation." The UFW argues as if this is an inflexible requirement. While a business's later profitable operation may be probative of the determination of lost profits, it is not a sole or mandatory requirement. It is but one of several

factors useful in determining whether the claimed lost profits may be determined with sufficient certainty to be awarded or must be rejected as too speculative. Here, lost profits could be calculated with reasonable certainty.

### Methods of Calculating Crop Losses

■ The UFW argues the court erred in the method it used to calculate Maggio's crop losses.[18]

Maggio computed its crop losses by: (1) calculating an average yield per acre for broccoli, lettuce and carrots based on averaging yields from fields harvested before the strike for broccoli (376.7 cartons/acre)[19] and lettuce (625.4 cartons/acre)[20] or on published average yields per acre for the

---

[18] Maggio's summary of its damages was contained in plaintiff's exhibit 86. The UFW contends the court erred in admitting exhibit 86 because it was not supported by expert testimony. Exhibit 86 was merely a compilation of data from Maggio's own records or from publications which were entered into evidence or available to the UFW and upon which simple arithmetic had been used. The data used came from Maggio's records or standard publications and were not drawn from expert opinion. This exhibit was properly admitted without expert testimony.

[19] To compute the average yield per acre for broccoli, Maggio chose four of its ten broccoli fields which were harvested before the strike. These four fields were represented to be typical fields. Maggio's calculations are as follows:

| Field | Acreage | Yield (cartons) | Yield per acre |
|---|---|---|---|
| 28A | 96 | 38,814 | 404.3 |
| 15D | 36 | 12,767 | 354.6 |
| 34 | 75 | 24,053 | 320.7 |
| 9B | 31 | 14,010 | 451.9 |
| Totals: | 238 | 89,644 | 376.7 |

Maggio determined it had been unable to harvest four broccoli fields due to the illegal strike activity for a loss of 99,449 cartons of broccoli (264 total acres × 376.7 cartons/acre) and was only partially able to harvest two other fields for a loss of 31,171 cartons of broccoli (117 acres × 376.7 cartons/acre—12,903 cartons actually harvested), thus suffering a total broccoli crop loss of 130,620 cartons.

[20] To compute the average yield per acre for lettuce, Maggio used the five lettuce fields which had been fully harvested before the strike. These five fields were represented to be typical fields. Maggio's calculations were as follows:

| Field | Acreage | Yield (cartons) | Yield per acre |
|---|---|---|---|
| 29A | 43 | 26,053 | 605.9 |
| 29D | 61 | 38,789 | 635.9 |
| 7A | 73 | 44,917 | 615.3 |
| 30B | 75 | 48,779 | 650.4 |
| 30A | 75 | 45,977 | 613.0 |
| Totals: | 327 | 204,515 | 625.4 |

Maggio claimed it was unable to harvest five lettuce fields which represented 255 acres and thus suffered a lettuce crop loss of 159,477 cartons (255 acres × 625.4 cartons/acre).

Imperial and Coachella Valleys for carrots (18 tons/acre);[21] (2) multiplying the average yield per acre by the number of acres not harvested due to the strike to obtain the total units lost for each crop; (3) multiplying the total units lost by the midrange of prices published for the crops for the first week each field should have been harvested (4) adding in the cooling revenue lost for the cartons not harvested,[22] and (5) subtracting out harvesting and packing costs which were determined on a per unit basis using published average costs for the Imperial Valley.[23]

The trial court used Maggio's acreage figures, its prices, the average yields per acres for the lost broccoli and lettuce but not for carrots (the court used an average yield of 16.8 tons per acre rather than Maggio's 18 tons per acre) and used slightly higher harvesting costs for lettuce ($2.35/carton v. Maggio's $2/carton) and broccoli ($3.40/carton v. Maggio's $3.20/carton). The trial court also reduced the award by deducting returns and allowances[24]—five percent in returns and allowances for broccoli and carrot and ten percent for lettuce.[25]

### Calculation of Average Yield/Acre

The UFW has a number of objections to the court's reliance on Maggio's average yield per acre calculations. The UFW contends there was no evidence to show the fields used to calculate the average yields/acre for broccoli and lettuce were typical. The UFW argues the fields selected "were not typical because they were harvested during a period when there were abnormalities in price which plaintiff conceded would affect the yields."

Initially, we note the UFW's argument is again based on an unsupported assertion of what the record contains, i.e., that Maggio conceded abnormalities in the price would affect yields. Second, there was evidence showing

---

[21] To compute the average yield per acre for carrots, Maggio relied on an average yield of 18 tons per acre in the Imperial and Coachella Valleys as published in "Marketing California Carrots, 1980." Maggio calculated the carrots in hundred weights (cwt), using 360 hundred weights per acre. Maggio calculated a loss of 2 carrot fields totaling 154 acres for a loss of 55,440 hundred weight of carrots.

[22] Maggio calculated it lost cooling revenues of $62,697 for broccoli ($.48/carton lost cooling revenue × 130,620 cartons lost); $34,927 for carrots ($.63 net cooling revenue/hundred weight (cwt) × 55,440 cwt); and $36,680 for lettuce ($.23/net cooling revenue per carton × 159,477 cartons lost) for a total lost net cooling revenue of $134,304.

[23] Maggio used a harvesting cost of $3.20 per carton for broccoli, $6.94 per hundred weight for carrots and $2 per carton for lettuce.

[24] The returns and allowances represent the difference between the gross and net sales figures.

[25] The returns and allowances deducted by the court amounted to $49,372 for broccoli, $27,398 for carrots and $142,425 for lettuce.

that Maggio management selected these fields because they were representative of "the best expectation that they had for what they were going to get or what they would have gotten had they not been interfered with." There was testimony that some of the fields harvested before the strike against Maggio was sanctioned were excluded from the calculation because they were affected by slowdowns by the union workers. While the UFW, in cross-examination of Roger Britt, the individual who compiled the crop loss damages for Maggio, showed the average yields per acre would have been lower for the broccoli[26] and lettuce[27] if Britt had used the yields from all the fields harvested before the strike against Maggio was sanctioned, the difference was not so great, particularly in light of testimony indicating some harvesting was affected by work slowdowns, so as to compel the court to reject Maggio's calculation of the average yield per acre as being an unreliable indicator of the yield per acre Maggio would have received on the fields it was unable to harvest because of the illegal strike activity.

The UFW also contends the trial court should have rejected Maggio's estimated yields/acre because they differed from yields reported in the

---

[26] The broccoli fields harvested before the strike was sanctioned which the UFW contends should have been included in Maggio's calculations were as follows:

| Field | Acreage | Yield (cartons) | Yield per acre |
|-------|---------|-----------------|----------------|
| 28C | 8 | 2,240 | 280.0 |
| 116 | 70 | 27,390 | 391.2 |
| 130 | 32 | 4,383 | 136.9 |
| 103 | 40 | 13,890 | 347.2 |
| 104 | 38 | 16,238 | 427.3 |
| 109 | 52 | 16,052 | 308.6 |
| | 240 | 80,193 | 334.1 |

Excluding fields 28C, 130 and 109 (fields with significantly lower yields) from the calculations, results in a yield of 388.6 cartons/acre, significantly higher than Maggio's use of 376.7 cartons/acre.

If one combines the total cartons harvested from all the fully harvested prestrike broccoli fields, both those used by Maggio (89,644—see, *ante*, fn. 19) and those the UFW contends should also have been considered (80,193), and divide the total yield of 169,837 by the total acreage of 478 (238 from the fields Maggio used plus 240 from the fields the UFW contends should have been included), the result is a yield of 355.3 cartons/acre.

[27] In calculating the average yield per acre for lettuce, Maggio excluded two lettuce fields which had been partially harvested before the strike:

| Field | Acreage | Yield (cartons) | Yield per acre |
|-------|---------|-----------------|----------------|
| 4A | 31 | 9,285 | 299.5 |
| 7C | 72 | 23,519 | 326.6 |
| | 103 | 32,804 | 318.5 |

When combined with the yields from the fully harvested prestrike lettuce fields (327 acres yielding 204,515 cartons of lettuce), the yield becomes 551.9 cartons per acre (237,319 cartons divided by 430 acres).

Federal-State Marketing News Survey (FSMNS)[28] and from Maggio's own estimate of yields contained in a 1978 loan application.[29]

Initially we note the court awarded damages for the lost carrot crop based on the FSMNS.[30] Second, while it may be true that the use of the FSMNS or Maggio's preharvest estimates may be valid methods of estimating what yields Maggio would have otherwise obtained in 1979, we cannot say, as a matter of law, that either method is required or that the method used by Maggio and adopted by the court must be rejected. We find no reversible error in the method the court used to calculate the crop yields.

---

[28] The FSMNS for broccoli yields in the Imperial Valley showed:

| Year | Yield per Acre |
|------|----------------|
| 1978 | 278 cartons (Coachella and Imperial Valleys) |
| 1979 | 165 cartons |
| 1980 | 290 cartons |
| 1981 | 257 cartons |

The FSMNS for carrot yields in the Imperial Valley showed:

| Year | Yield per Acre |
|------|----------------|
| 1977 | 16.7 tons |
| 1978 | 16.5 tons |
| 1979 | 15.6 tons |
| 1980 | 18 tons |
| 1981 | 19.1 tons |
| 1982 | 21.8 tons |
| 1983 | 20.8 tons |

The FSMNS for lettuce yields in the Imperial Valley showed:

| Year | Yield per Acre |
|------|----------------|
| 1977-1978 | 502 cartons |
| 1978-1979 | 475 cartons |
| 1980-1981 | 449 cartons |
| 1981-1982 | 504 cartons. |

[29] In 1978 Maggio submitted a loan application to obtain funds to grow and harvest its crops and joint venture crops. The application contains an estimate of the expected yields per acre and prices per unit which Maggio expected to receive. Maggio estimated it would obtain 300 cartons of broccoli per acre to sell at $5.80 per carton, 500 cartons of lettuce per acre to sell at $3.58 per carton and 650 sacks of carrots which to sell at $4.20 per sack.

[30] The court awarded damages for the lost carrot fields based on an average yield of 16.8 tons per acre. This amount is the average of the FSMNS yields for 1979 (15.6 tons per acre) and 1980 (18 tons per acre).

## Calculation of Prices for Lost Crops

██ The UFW complains the damages awarded to Maggio resulted in windfall profits because not only did the trial court award damages for all crop losses occurring during the strike but calculated damages for the lost lettuce fields based on the high prices of the strike year.

The evidence presented at trial indicated the 1979 prices for lettuce were higher than other years. Carl Maggio admitted at trial that "during the 1979 lettuce season other growers that were not struck probably made a lot of money" and that the UFW strike contributed to making the lettuce market profitable. The FSMNS attributed the rise in lettuce prices in 1979 as due, in part, to the strike. The UFW also presented evidence indicating that the use of the strike prices plus the yields suggested by Maggio resulted in an award of damages to Maggio that gave Maggio profits greater than it had received in years before and after the strike.[31]

However, there was also evidence that increases in the lettuce price were additionally due to frost damage and a hiatus in the October planting due to heavy rains. There was evidence the broccoli prices for 1979 were not so disparate with the four-year average price as were lettuce prices, and, in fact, broccoli prices were lower than the average price at certain points during the 1979 season. The UFW does not object to the carrot prices as being excessive.

In arguing the court improperly awarded damages based on the high prices for lettuce in 1979, the UFW ascribes all of the price increase to the effects of the strike. The trial court, however, was not required to accept the UFW's position that all the increase was due to the strike and not to weather and planting conditions. Essentially, the UFW is asking us to reweigh the facts and to make a factual determination as to what portion of the 1979 lettuce prices reflect the strike activity as opposed to weather and

---

[31] For example, the UFW presented evidence that Maggio's tax returns showed the following:

| Year | Loss/Gain |
|------|-----------|
| 1976 | ($528,438) loss |
| 1977 | $474,701 gain |
| 1978 | ($154,242) loss |
| 1979 | $394,734 gain |
| 1979 with loss claim: | $2,272,000 gain |

Maggio's books showed its Imperial Valley division for 1978 had an operating loss of $501,382 and a profit of $96,701 in the year ending July 31, 1979. If the damage award of $1,679,453 is added to the 1979 profit, then Maggio shows a profit for 1979 of $1,776,154.

other factors. As we have stated before, it is not our function to act as the fact finder or to reweigh the evidence presented to the trial court. We conclude that given the evidence that the strike was but one factor causing an increase in lettuce prices, indications that broccoli and carrot prices were not so inflated by the strike and the UFW's failure to establish the part of the price increase caused by lawful strike activity, the trial court was entitled to conclude the strike was a lesser factor in the price rise and to use the 1979 lettuce prices rather than the four-year average suggested by the UFW.[32]

## C.

### Collateral Source Rule

The UFW complains the court erred in applying the collateral source rule to preclude an offset of the damages by the amount Maggio received from the Fair Negotiating Committee.

The Fair Negotiating Committee was formed on January 31, 1979 by produce growers in California and Arizona. Under the Fair Negotiating Committee agreement, the growers agreed to pay to the committee a portion of each carton sold.[33] This money was intended to reimburse growers who were unable to harvest lettuce due to strike activity at a rate of up to $1,100 per acre for unharvested lettuce. The Fair Negotiating Committee agreement also provided the committee "shall return any part of assessments as may be necessary under ARTICLE V [involving disbursements for crops unharvested due to strike activity] and shall issue calls for assessments from the appropriate participants on a weekly basis to provide funds for those purposes." Maggio paid assessments of $51,784.50 and received payments of $564,575 from the Fair Negotiating Committee.

---

[32] The UFW also complains the court improperly awarded cooling revenue to Maggio because Maggio's cooler was shut down at the beginning of the strike because cooler workers refused to work. The cooling revenue is the amount Maggio charged for cooling (either hydrocooling or vacuum) his produce. Maggio cooled all his produce. Maggio testified the cooling process is automated and requires little human labor. Based on this evidence, the court could conclude Maggio would have obtained the revenue from cooling had the harvesting not been interfered with by the tortious activity of the union.

[33] The maximum amount of the assessments were set as follows in the Fair Negotiating Committee Agreement:

| Market Price per Carton | Assessment |
|---|---|
| $ 3.00 | $ .25 |
| 3.50 | .50 |
| 4.00 | .75 |
| 4.50 | 1.00 |
| 5.00 | 1.50 |
| Above 5.00 | 50% of Price above $5.00 |

 Under the "collateral source rule" when a person has suffered a personal injury or property damage due to the wrongful act of another, "an action against the wrongdoer for the damages suffered is not precluded nor is the amount of damages reduced by the receipt by him of payment for his loss from a source wholly independent of the wrongdoer. [Citations.]" (*Anheuser-Busch, Inc.* v. *Starley* (1946) 28 Cal.2d 347, 349 [170 P.2d 448, 166 A.L.R. 198].) The collateral source rule reflects a policy judgment encouraging individuals to purchase insurance, functions to prevent juror confusion in assessing general damages and overcomes the plaintiff's disadvantage resulting from the usual attorney's contingent fee contract where a large portion of the recovery goes to the attorney rather than to compensate the plaintiff as the jury may have intended. (*Helfend* v. *Southern Cal. Rapid Transit Dist.* (1970) 2 Cal.3d 1, 11-12 [84 Cal.Rptr. 173, 465 P.2d 61, 77 A.L.R.3d 398].) The rule applies "in tort cases in which the plaintiff has been compensated by an independent collateral source—such as insurance, pension, continued wages, or disability payments—for which he had actually or constructively . . . paid or in cases in which the collateral source would be recompensed from the tort recovery through subrogation, refund of benefits, or some other arrangement." (*Id.* at pp. 13-14.)

 Here, the Fair Negotiating Committee was a source independent and collateral from the UFW, its members or other wrongdoer. It was akin to insurance, i.e., a pooling of resources by individuals to provide a fund to pay losses due to certain risks (lost crops due to strike activity). The UFW attempts to avoid the collateral source rule by pointing to an individual's duty to mitigate damages, arguing formation of the Fair Negotiating Committee was an attempt to mitigate damages and concluding, therefore, the payments made by the Fair Negotiating Committee should be offset against the award against the UFW. This argument, however, would apply equally in the traditional insurance context, i.e., that the insured, fearing possible losses might occur in the future attempts to mitigate his possible future losses by obtaining insurance. The Supreme Court has clearly held the collateral source rule applies to insurance payments made in tort cases. We believe the trial court correctly ruled the Fair Negotiating Committee payments were from a collateral source and therefore would not reduce the judgment.

### D.

### *Security Guard Expenses*

 The UFW contends the court improperly awarded Maggio all its claimed security guard expenses. The UFW asserts the claimed expenses included Maggio's normal security costs and costs which were not due to illegal strike activity.

The UFW points out Maggio normally maintained a year round security force, Carl Maggio testified the decision to hire additional security was based on the January 29 confrontation and he "did not mention a single other incident which influenced his decision to increase security." The UFW also points to the testimony of Maggio Vice-President George Stergios who testified when he was in charge of selecting guard positions he placed guards "wherever we had people working that we thought it would be unsafe or we had equipment that needed protecting." The UFW then argues:

"Although Maggio claimed he did not intend to have that kind of security for the carrot harvest, he did in fact arrange for security for locations where there was activity prior to January 29, *so it is likely that he would have done so* for the carrot operation as well, regardless of whether anything occurred on January 29th. Maggio simply expended more in February as the company's activities expanded to more locations in the fields and shed as more personnel crossed picket lines." (Italics added.)

Initially, we note the UFW has not cited the record to support its assertion Maggio "in fact arrange[d] for security . . . prior to January 29." The UFW, as the appellant, bears the burden of showing reversible error and when, as here, the error is addressed to the sufficiency of the evidence, must set out a fair and adequate statement of the evidence which is claimed to be insufficient with citations to the record. (See *Brown* v. *World Church* (1969) 272 Cal.App.2d 684, 690-691 [77 Cal.Rptr. 669, 45 A.L.R.3d 622].) The UFW cannot shift this burden to Maggio nor expect the reviewing court to undertake an independent examination of the record. (*Id*. at pp. 690-691.) Thus, to the extent the UFW's argument depends on unsupported characterizations of the evidence presented to the court, we need not address the arguments.

Additionally, we note the UFW's assertion the trial court improperly awarded security costs which would have occurred even without the violence or threats of violence, is based on speculation, i.e., the UFW's speculation that although Maggio claimed he did not intend to have security for the carrot harvest "it is likely that he would have done so" regardless of the incidents of January 29. Here, there was evidence Maggio hired additional security guards because of the January 29 incident. The trial court was entitled to believe that testimony.

Finally, we note at the outset of the trial when the UFW argued Maggio should not be allowed to recover for any of its normal security costs or for security costs incurred before the first violence on January 29, Maggio agreed and stated it would not seek reimbursement for normal security costs or costs incurred before January 29. The UFW has not cited evidence

showing the claim was not as represented. No reversal is required on this ground.

### E.

### *Housing Costs*

The UFW contends the court improperly awarded Maggio the costs of housing replacement workers in a motel. The UFW contends the housing costs were not justified because: (1) there was no illegal activity by the strikers which required housing replacement workers in motel rooms rather than the labor camp; (2) Maggio failed to show the costs of housing replacement workers in a motel was higher than the costs Maggio otherwise would have incurred for housing workers and (3) the court improperly awarded housing costs incurred before February 26.

The record shows night picketing occurred at the Sanchez labor camp beginning on February 5 and continuing until the early morning hours of February 9. The picketing began around sunset and continued until 3 or 4 a.m. and resulted in numerous reports of rock throwing by the picketers. On February 8, there was a gun fired towards the camp by one of the picketers.[34] There was other evidence indicating UFW strikers followed replacement workers to their homes, threatened to burn down their homes and hurt the families of replacement workers, burned or damaged vehicles or homes belonging to replacement workers, and physically assaulted replacement workers near their homes. The UFW leadership was involved in organizing the night and residential picketing and was involved with the "Phantom Crew" which engaged in illegal activity against replacement workers at night and near their homes.

Based on this record, the trial court could reasonably conclude the UFW was involved in illegal strike activity against the replacement workers at the labor camps and near their residences and that a threat of violence continued after the nighttime picketing was halted at the Sanchez labor camp. The court could further conclude this threat was particularly acute against the group of Arab replacement workers brought in from Delano whom the UFW identify as "the first real worker crew to break the strike" and whom Maggio housed at the motel.

The UFW contends the court's award of housing costs was improper because Maggio failed to establish the cost of housing workers at a motel was higher than normal worker housing costs. This contention presupposes Maggio normally paid the housing costs of its workers. The UFW, however,

---

[34] There was also evidence suggesting that shots were fired by the replacement workers towards the picketers.

does not cite any evidence in the record to support this supposition or to show error by the court. We therefore assume the judgment is correct in this respect.

Finally, the UFW complains the court awarded Maggio housing costs incurred before February 26 even though Maggio conceded it was not entitled to housing costs incurred before that date. Maggio responds by reaffirming its position that it was requesting only housing costs incurred after February 26 and points to plaintiff's exhibit 73 as support. Plaintiff's exhibit 73 is a compilation of housing costs listing payments by Maggio check number, amount, date paid and housing period covered. As the UFW points out, included on plaintiff's exhibit 73 is Maggio check number 7395 for $1,008 paid on March 15, 1979 to cover "Rent for bunch workers for February, 1979, 28 days @ 36.00/day, 2 rooms, Park Manor Hotel." Since Maggio agrees it was entitled to housing costs only from February 26, the award should reflect it was entitled to recover on check number 7395 for only two days ($72) rather than twenty-eight ($1,008). Accordingly, the judgment should be reduced by $936 ($1,008-$72).

F.

### Property Damage

■ The UFW complains about the court's award of property damages, contending plaintiff's exhibit 74 does not support the award. The UFW argues:

"Angulo [a bookkeeper for Maggio] simply prepared PX 74 by going through the vendor files to ascertain what invoices pertained to 'damages *during* the strike' (RT: LXIII, 16,314). Apparently neither she nor plaintiff's counsel cross-checked the list with the testimony to establish that plaintiff had in fact established a nexus between the damages and the union." (Italics by Union.)

This argument is contradicted by the record where Maggio's counsel explained:

"There were substantially more vehicle incidents that were put into evidence in this case. Some of them were stricken by the court, others simply were not considered because of a lack of a nexus, this list has simply been prepared from those items that were permitted by the court to come into evidence with an appropriate witness being present as to either the victim or a witness to the specific incident."

Nonetheless, the UFW contends "the record is totally void of evidence that the '*union* directly damaged vehicles', and there is scant evidence upon

which to base most of the claims." This assertion is made in the opening brief and is unsupported by any citations to the record. In its reply brief, the UFW objects to awards for specific items of property damage: (1) $161.13 for damage to sprinkler trailer tires because it was not shown the damage was caused by the Union; (2) $464.65 for damage to windows of Maggio vehicles on February 4 because the record does not support that kind of damage on February 4; (3) $1,125.41 for damage to the windows ($201.25) and body ($924.16) of a 1979 Ranchero because, the UFW asserts, this car was assigned to Pepe Carrillo during the strike and he did not testify at trial; (4) $75.26 for damage to the windows of a 1971 pickup truck because there was an insufficient showing the damage was caused by strikers; (5) $149.50 for damage to a 1978 Monte Carlo belonging to a replacement worker because the replacement worker did not witness the damage.

Of these items, there is merit to the UFW's objection to the award for damage to Lopez's vehicle since the court struck his testimony on the subject based on an insufficient showing connecting the damage to the UFW strikers. Accordingly, the award should be reduced by $75.26. As to the other items, there was evidence of other damage to sprinkler trailers and to buses and trucks on February 5 (therefore suggesting the use of the February 4 date was a mere oversight), the UFW's assertion the 1979 Ranchero was assigned to Pepe Carrillo is a bald assertion unsupported by any citation to the record and the reimbursement for the damage to the 1978 Monte Carlo was sufficiently supported by evidence and inferences drawn from that evidence indicating UFW strikers had damaged the replacement worker's car.

Further, we note the UFW has failed to point out where it objected to the court's calculation of the property damage. In particular, we note the trial court issued an intended decision setting out its intended award for property damage. At that time, the UFW entered objections to nearly every aspect of the court's award, but made none to the proposed property damage award. Nor did the UFW raise its specific objections on appeal until its opening brief, but waited until its reply brief, after Maggio had filed its brief. This conduct could be construed as waiving the objections.

### Proceeds from the Mutual Harvest Effort

The UFW contends the court should have reduced the award by the amount Maggio received from the Mutual Harvest Effort.

The Mutual Harvest Effort was a group of eight struck growers who decided to mutually harvest lettuce fields and equally divide the proceeds from the harvesting. Fields to be harvested were selected by a committee based on whether the field was ready for harvest and where it was located.

The UFW argues:

"In preparing the damage computation, Britt did not take into account the MHE efforts to harvest lettuce. He just focused on the five lettuce fields 'available for harvest at the time of the illegal activity that were never harvested', and simply developed 'data which led to the reasonable expectation' on cost, yield and revenue (RT: LXIX, 17,716). Britt conceded that if he was 'attempting to calculate the overall damages suffered by Mr. Maggio', he would take into consideration the lettuce harvested by Maggio during the strike that came from sources other than his fields. Had Britt taken this lettuce into consideration, Maggio's damage claim would have been offset by net profits for at least 18,149 boxes of lettuce."

Initially, we note the UFW has failed to cite the record to support its argument—there is no citation to where Britt made his "concession" or to support the UFW's assertion that "net profits for at least 18,149 boxes of lettuce" should have been offset.

Second, at oral argument, Maggio represented that it had not sought damages for any of its fields which were harvested by the Mutual Harvest Effort even though the Mutual Harvest Effort was inefficient and Maggio suffered substantial losses on those fields. The UFW did not dispute this point, but argued it was nonetheless entitled to an offset.

The trial court, however, was not required to adopt the UFW's position and interpretation of the evidence. The trial court was entitled to conclude the losses Maggio sustained on fields harvested by the Mutual Harvest Effort was equivalent to the proceeds Maggio received from the Mutual Harvest Effort and therefore a reduction in the damages awarded against the UFW was not warranted. We conclude no reversal is required on this ground.

## III

### Timeliness of Prosecution

 The UFW contends the court erred in denying its motion to dismiss because Maggio had not diligently prosecuted the case.

Maggio and other growers sued the UFW, numerous individuals and 1,500 Does for damages caused by unlawful strike activity on January 28, 1980, one day before the one-year statute of limitations expired. The Union was properly served on December 20, 1980, after improper attempts at service had been made on May 28, 1980, and August 13, 1980. The UFW filed a demurrer to the complaint which was overruled in February 1981. In September 1981, the growers filed a stipulation, unsigned by the UFW,

regarding amendments to the complaint. In November 1982, after several phone calls between counsel, the growers sent the UFW a copy of a proposed amended complaint and one of the growers agreed to dismiss its suit against the UFW. During this period, there were also ALRB proceedings ongoing involving the 1979 strike, with a settlement being reached and thereafter reviewed by the ALRB. In March 1983, the UFW filed a motion to dismiss, claiming the growers had failed to diligently prosecute the action and to bring the case to trial within two years. On May 9, 1983, the growers filed a first amended complaint against the UFW and 1,500 Does. On May 27, 1983, the court denied the UFW's motion to dismiss for lack of diligent prosecution, stating: "A review of the record included communications between counsel leads this court to conclude that there existed reasonable excuse for delay and finds there was lack of prejudice to the defendant."

At the time the UFW's motion was heard, Code of Civil Procedure section 583, subdivision (a)[35] provided in relevant part: "The court, in its discretion, may dismiss an action for want of prosecution pursuant to this subdivision if it is not brought to trial within two years after it was filed."

 The purpose of the statute is to compel reasonable diligence in the prosecution of lawsuits. (*Jensen* v. *Western Pac. R. R. Co.* (1961) 189 Cal.App.2d 593, 596-597 [11 Cal.Rptr. 444].) It is designed to promote "the trial of cases before evidence is lost, destroyed, or the memory of witnesses becomes dimmed." (*General Motors Corp.* v. *Superior Court* (1966) 65 Cal.2d 88, 91 [52 Cal.Rptr. 460, 416 P.2d 492].)

 In ruling on a motion to dismiss because the plaintiff has not brought the case to trial within two years, the trial court should be guided by the policy favoring trial on the merits over a dismissal for failure to prosecute with reasonable diligence. (Cal. Rules of Court, rule 373.) "[A]lthough the interests of justice weigh heavily against disposing of litigation on procedural grounds—a policy we reaffirm—that policy will necessarily prevail only if a plaintiff makes some showing of excusable delay. [Citations.]" (*Salas* v. *Sears, Roebuck & Co.* (1986) 42 Cal.3d 342, 347 [228 Cal.Rptr. 504, 721 P.2d 590], fn. omitted.) The trial court should also consider the prejudice suffered by the defendant. (See *Hurtado* v. *Statewide Home Loan Co.* (1985) 167 Cal.App.3d 1019, 1030 [213 Cal.Rptr. 712] [affirmative showing of actual prejudice required before the dismissal sanction will be approved]; *Wong* v. *Davidian* (1988) 206 Cal.App.3d 264, 270 [253 Cal.Rptr. 675] [affirmative showing of actual prejudice is not required to support dismissal when the delay is unreasonable].)

---

[35] Subdivision (a) of section 583 has been recodified as part of a general reorganization of the statutes dealing with dismissals for delay in prosecution (§ 583.410 et seq.; see generally, § 583.100 et seq.) effective January 1, 1985.

The trial court has wide discretion in ruling on a motion to dismiss for lack of diligent prosecution and its decision will not be reversed absent an abuse of discretion. (*Blank* v. *Kirwan* (1985) 39 Cal.3d 311, 331 [216 Cal.Rptr. 718, 703 P.2d 58].) "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court. [Citations.]" (*Shamblin* v. *Brattain* (1988) 44 Cal.3d 474, 478-479 [243 Cal.Rptr. 902, 749 P.2d 339].) A trial court's decision to deny a motion to dismiss is not as closely scrutinized on appeal as a decision to dismiss because the law favors decisions on the merits. (See *Corlett* v. *Gordon* (1980) 106 Cal.App.3d 1005, 1012 [165 Cal.Rptr. 524].)

Here, the record shows the UFW had notice of the lawsuit soon after it was filed in January 1980 although it was not properly served until December 1980. In this intervening period, the UFW moved to quash service as improper. Early in 1981, the UFW filed a demurrer which was overruled. The UFW and the growers also exchanged correspondence as to possible amendments to the complaint. In 1982, the UFW and the growers had telephone communications about amending the complaint and the growers sent the UFW a proposed amended complaint. Also during this period there was an ALRB proceeding pending which resulted in a settlement in January 1983. These circumstances of ongoing communications between the growers and the UFW and the pendency of another proceeding before the ALRB support the trial court's conclusion of excusable delay.

The UFW states it was severely prejudiced by the delay because it had difficulty locating witnesses including workers and staff and because witnesses' memories faded.[36] While it may be true that, by the time trial began several years later, the UFW had some trouble locating witnesses and some of the witnesses' memories had faded, this record does not show an abandonment of the litigation by the plaintiffs so as to lull the UFW into inaction. There were continuing contacts between the UFW and the growers from the time the suit was filed until the UFW made its motion to dismiss. During this period, the UFW had the opportunity to locate witnesses and to freeze witness memories by taking depositions.

We conclude the trial court did not abuse its discretion when it decided the case should be tried on its merits rather than dismissed for a failure to bring the matter to trial within two years.

---

[36] The UFW also states it was prejudiced because records relating to the Fair Negotiating Committee were destroyed in 1983. Prejudice flowing from this destruction is minimal given the ruling the Fair Negotiating Committee was a collateral source whose payments would not reduce the amount of the judgment.

## IV

### *Sanctions*

The UFW requests sanctions for Maggio's assertedly frivolous motion to dismiss the UFW's appeal because the UFW's notice of appeal had not been timely filed. The UFW makes this request in the small print of the very last footnote of the opening brief which merely refers to the arguments made in its opposition to the motion to dismiss. We decline to award attorney's fees. The motion to dismiss was not clearly frivolous nor brought solely to harass or delay.

### DISPOSITION

The judgment is modified by reducing the housing cost award by $936 for housing costs incurred before February 26 and by reducing the property damage award by $75.26 for vehicle damage which was not sufficiently linked to the UFW. As modified, the judgment is affirmed. Each side to bear their own costs.

Froehlich, J., and Nares, J., concurred.

Appellant's petition for review by the Supreme Court was denied May 16, 1991. Mosk, J., and Broussard, J., were of the opinion that the petition should be granted.